**UNITED STATES of America**

v.

**NORTHSIDE REALTY ASSOCIATES, INC. and Browning-Ferris Industries of Georgia, Inc., et al.**

**Nos. CR 80–62A, 80–136A.***

United States District Court, N. D. Georgia, Atlanta Division.

March 17, 1981.

* U. S. v. David Alexander, CR 79–09 N; U. S. v. Alvin Bernardo Wright, CR 79–91–A; U. S. v. Dale Campbell, CR 79–196–A; U. S. v. Robert A. Snowden, CR 80–08 G; U. S. v. Kaushik Kapadia, CR 80-11 N; U. S. v. Richard Bearden, CR 80–14 N; U. S. v. John Almond Deardoff, CR 80-18 R; U. S. v. Robbie Dean Hall, CR 80–21 R, CR 80–38 R, CR 80–40 R; U. S. v. Perry G. Evans, CR 80–24 R; U. S. v. Eddie Joe Tinsley, CR 80-180 A; U. S. v. Mark Edgar Grainger, CR 80–209 A; U. S. v. Jerry Suggs, CR 80–235 A; U. S. v. Ezzard Ferguson, CR 80 239 A; U. S. v. Donald Carl Thompson, CR 80 262 A; U. S. v. Michael W. Cassel, CR 80 266 A; U. S. v. St. Vouis Raymond, CR 80 268 A; U. S. v. Gary Rogers, CR 80–273 A; U. S. v. Clarence Stowers Jr., CR 80–276 A; U. S. v. Derek John Hiscutt, CR 80 285 A; U. S. v. Franklin Daniel Stanford, CR 80- 286 A; U. S. v. James Boderick, CR 80 287 A; U. S. v. Clinton Jerome Rhymes, CR 80 298 A; U. S. v. Herman Lee Smith, CR 80- 299 A; U. S. v. Mary Nell Hart, CR 80 -301 A; U. S. v. Gary Bissell, CR 80 -306 A; U. S. v. Eric Nygard, CR 80- 307 A; U. S. v. Johnny Page Hughes, CR 80–308 A; U. S. v. Richard Roberts, CR 80 310 A; U. S. v. Farrell Nixdorf, CR 80 313 A; U. S. v. Mose Austin, CR 80 -323 A.

Janet King, Asst., U. S. Atty., Atlanta, Ga., John Fitzpatrick, John Orr, Carl Mullis, Anti-Trust Div., Dept. Justice, Atlanta, Ga., for plaintiff.

Richard Elliott, John Martin, Atlanta, Ga., David Kairys, Philadelphia, Pa., Robert Altman, Reber Boult, Paul H. Kehir, Joab Kunin, Richard D. Allen, William Weller, Harold A. Miller, III, Trammell Vickery, Trammell Newton, Daniel Kane, Woodrow Vaughan, P. Bruce Kirwan, Hugh Gibert, C. David Vaughan, Jane Wilcox, S. Richard Rubin, Elizabeth Edelman, William Maycock, Torin D. Togut, Halsey G. Knapp, Jr., J. Kevin Buster, Daisy Hurst Floyd, Leigh R. Bodner, Penn Payne, Hugh Peterson, Michael Eric Ross, Scott Jacobson, Charles Kidd, Ted Price, Thomas Rhodes, D. Robert Cumming, T. J. Carey, Joe Bynum, David Lavance, Mark Kadish, Mary Donovan, Larry Thompson, Hugh M. Worsham, Jr., Leah J. Sears, Jay Strongwater, Atlanta, Ga., Scott McLarty, Decatur, Ga., Michael Parham, East Point, Ga., John O. Bouwsma,

Clarksville, Ga., Peter C. Clemente, Miami, Fla., David J. Clark, Frank G. Smith, III, James Gilbert, Amy Totenberg, Atlanta, Ga., Ted Healey, Gainesville, Ga., Melvyn Kessler, Miami, Fla., for defendants.

## MEMORANDUM OPINION

KEADY, Chief Judge, Sitting by Designation.

In this consolidated proceeding the court must deal with motions of various defendants to dismiss indictments on the ground of statutory and constitutional deficiencies in the selection of grand and petit jurors in the Northern District of Georgia.[1] Our present consideration is restricted to procedural issues raised by the government's challenge to the timeliness of defendants' motions under the Jury Selection and Service Act, 28 U.S.C. § 1861 et seq. and Rule 12, F.R.Crim.P.

### (a) *Real Estate Defendants.*

On March 20, 1980, the real estate defendants were indicted on several counts of criminal anti-trust violations; at arraignment on the following day, they pled not guilty. On July 17, the magistrate assigned to the case entered an order allowing three weeks following receipt of certain materials from the clerk's office for these defendants to file motions to dismiss the grand jury indictment because of alleged substantial departures in the administration of the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861 et seq. On August 18, the real estate defendants filed their original motion to dismiss the indictment which charged various deficiencies in the administration of the jury selection plan, to-wit:

1. Erroneous determinations of jury qualifications, exemptions and excuses by individuals delegated authority by the court.

 A. Wrongful exclusion of qualified potential jurors by court employees.

 B. Unlawful exclusions from grand jury selection ·process by jury clerk.

 C. Alleged effect of actions of court employees and jury clerk on randomness, objectivity and fair cross-section.

2. Statutory violations based on permanent excuses from jury duty.

3. Failure to operate selection mechanism according to the selection plan.

4. Statutory violations based on failure to revise qualified jury wheels.

In addition, defendants raise constitutional claims of race and, later, sex,[2] bias on the part of the district judges in the selection of grand jury forepersons and deputy forepersons. A second constitutional challenge was based on gender discrimination in the granting of excuses from jury duty. Because of the challenge relating to the selection of forepersons, all sitting district judges in the Northern District of Georgia disqualified themselves, and, upon application of Honorable James P. Coleman, Chief Judge of the United States Court of Appeals for the Fifth Circuit, the undersigned judge was designated to hear all motions to dismiss indictments returned by the district's grand juries.

On November 25 this court, from the judge's home station in Mississippi, issued an order directing that the filing of further amendments, if any were to be made, must be accomplished by December 8. On that date the real estate defendants, without obtaining leave of court, further amended their motion to dismiss the indictment against them on the constitutional grounds that the plan of selection of grand and petit jurors for the Northern District of Georgia

---

1. Consolidated with this hearing are 34 criminal cases. All defendants and the government agreed to a consolidation of the hearing upon the pretrial motions to dismiss. The lead defendants in the case are Northside Realty Associates, Inc., et al., herein referred to as real estate defendants, and Browning-Ferris Industries of Georgia, Inc., et al., herein referred to as garbage case defendants; they will be mentioned by name, but unless the context otherwise requires, the court's disposition of their motions will govern all cases consolidated for the purpose of evidentiary hearings on the merits of defendants' motions to dismiss.

2. The charge of sex bias in selection of forepersons and deputy forepersons was made September 24.

impermissibly results in substantial underrepresentation of specified cognizable groups of citizens within the community, thus failing to reflect a fair cross section of the citizenry, and that this underrepresentation is further accentuated by failures in the clerk's office to pursue unreturned juror qualification questionnaires for a more accurate determination of the race, sex and economic status of such potential jurors.

It is the position of the real estate defendants that their latest amendment, filed December 8, was merely supplementary and added little, if any, new material to their previously filed motion to dismiss; or, in the alternative, that constitutional issues raised under Rule 12, F.R.Crim.P., may not be considered waived for failure to file timely. It is the government's contention that our November 25 order may not be properly taken as an invitation to real estate defendants to add new theories to an already wide-ranging challenge for which the defendants have heretofore taken nearly six months to prepare. The government asserts that the latest amendment of the defendants threatens to substantially protract these proceedings because the prosecution would require a significant amount of time to prepare to meet the issues raised in the amendment.

Real estate defendants, in their latest amendment, challenge the indictment on the following grounds:

A. The voter registration lists of the 46 counties of the Northern District, and four divisions thereof, as source lists from which grand and petit jurors are chosen, the process of selection, and the resulting pool are contrary to the Jury Selection Act and the Constitution of the United States, in that cognizable classes of eligible jurors, i. e., blacks, females, blue collar and service workers, and persons having less than a high school education, are being substantially underrepresented in the jury selection process.

B. Eligible jurors are being improperly disqualified or excluded based on place of residence, in violation of statutory and constitutional law.

C. Insufficient followup is being made by the clerk of court and his deputies as to nonreturned questionnaires, in violation of law.

D. Jurors are not drawn, selected or sworn in accordance with the federal statute and constitution.

E. There is a substantial failure to comply with the provisions of the Jury Selection Act.

F. The indictment in this case was handed down by a grand jury drawn from a jury pool that was not selected in accordance with the statute and the constitution.

G. Trial of defendants on this indictment before a jury drawn from the existing pool would violate the defendants' rights pursuant to federal statute and the constitution.

The essence of the principal part of the new grounds alleged by the real estate defendants assails the adequacy of voter registration lists as a proper vehicle for providing a fair cross section of the community in the selection of grand and petit jurors; in other respects the amended motion brings forward certain defects alleged to exist in the administration by court personnel of the district's jury plan.

(b) *Garbage Case Defendants.*

In the companion case, CR 80–136, the prosecution is against the garbage case defendants, who were also indicted on several counts of criminal anti-trust violations. The essential facts of this case follow:

On June 5, 1980, defendants pled not guilty to an indictment which was returned against them on May 29, 1980. Also on June 5, the assigned magistrate imposed a deadline of July 11 for the filing of motions. On July 22 the magistrate conducted a hearing in the garbage case in which a lengthy discussion ensued as to the type and character of the motions which the garbage defendants stated they proposed to file to dismiss their indictment. It was acknowledged by all present, including the magistrate, that the results of the ongoing but uncompleted investigation of the real estate

defendants were unknown. The magistrate plainly indicated to defense counsel that he disfavored the filing of any motions to quash an indictment not grounded in fact, but nevertheless allowed defense counsel approximately two weeks to supplement the record or file further motions. The garbage defendants filed no motion to dismiss the indictment until they first learned of the real estate defendants' motion, which was filed on August 18. That marked the first time that the garbage case defendants became privy to any information derived from the investigation of the real estate defendants. On August 28, the garbage case defendants first filed their motion to dismiss the indictment, urging grounds identical to those advanced by the real estate defendants in their August 18 motion.

Garbage case defendants, first before the magistrate and now before us, urge that it would have been highly disruptive to the clerk's office and its personnel for them to have started an investigation parallel to the one in progress by the real estate defendants; and they point out that a dual investigation might well have been a needless waste of time and money, depending upon which conclusions were reached in the real estate defendants' investigation. These defendants emphasized the fact that the information being gathered by the real estate defendants was kept confidential and that their attorneys refused to disclose results of their ongoing investigation. As previously stated, the garbage case defendants, within ten days after first having positive knowledge of the grounds of the real estate defendants' challenge, filed their own motion.

The several grounds of challenge raised by the real estate defendants, and adopted in toto by the garbage case defendants, were based on detailed in-depth investigation supported by affidavit of Donald Huprich, a law student who was employed by one of the firms representing the real estate defendants. It is evident that the deficiencies set forth in the motions to dismiss relate to subject matter not easily understood, nor likely to be immediately absorbed or comprehended by counsel for the garbage case defendants. As the record reveals, these allegations were made after a three months' investigation of the impanelment process and a review of every juror qualification questionnaire of persons who were deemed ineligible or who were excused by employees of the court.

On September 10 the magistrate ordered a hearing requiring attorneys for the garbage case defendants to show cause why their August 28 filing was not in violation of the court's timetable for resolution of pretrial matters. At this hearing the magistrate requested additional authority by way of memoranda or letter briefs filed by government and defense counsel from September 10 through October 14. The magistrate never issued a formal ruling,[3] or complied with Rule 12(e).[4]

With matters in this state, counsel for the garbage case defendants and for the real estate defendants commenced to coordinate their efforts. As early as September 24 they met with legal and statistical professionals with a view of employing experts to conduct a compositional study of the grand and petit juries for the entire district. On October 2 an Atlanta-based organization, known as the National Jury Project, was retained to make this study. On October 14, counsel for defendants moved the magistrate for access to additional records. Although the government's position was that further investigation was unnecessary be-

---

**3.** Magistrate Forrester has telephoned our law clerk that he informed counsel for the government and defendants after the show-cause hearing that, although he entertained serious doubts about the timeliness of the statutory grounds asserted under 28 U.S.C. § 1861, he was not inclined to find a waiver under Rule 12, F.R.Crim.P., because it appeared that constitutional issues would likely have to be heard.

**4.** (e) Ruling on Motion. A motion made before trial shall be determined before trial unless the court, for good cause, orders that it be deferred for determination at the trial of the general issue or until after verdict, but no such determination shall be deferred if a party's right to appeal is adversely affected. Where factual issues are involved in determining a motion, the court shall state its essential findings on the record.

cause of the untimeliness of the garbage case defendants' original motion filed on August 28, the magistrate nevertheless entered an order granting lead defense counsel, as well as specific individuals connected with the National Jury Project, access to additional relevant records in the clerk of court's office. On the day the order was entered, actual research of records commenced, and continued without interruption through October and November. As set forth in the uncontested factual averments in the affidavit of Attorney John R. Martin, data was gathered from the voter registration rolls of the 46 counties which comprise the judicial district and from the jury-eligible population of each county. This and other information pertinent to a compositional study was assembled to ascertain whether certain groups in the jury-eligible population were overrepresented or underrepresented using a selection plan, as authorized by the judges of the district, based wholly upon voter registration lists within the 46-county area. The garbage case defendants on December 3 filed an amended motion setting forth identical grounds of constitutional attack raised by the real estate defendants' previously mentioned December 8 motion. Affidavits setting forth facts developed by the compositional study carried out by the National Jury Project were placed on file by lead defense counsel within a matter of days after the completed data had been delivered to them.[5] Widespread publicity of the jury challenges appeared in the Atlanta newspapers and other media on November 11 and 12, 1980.

## ISSUES

The government seeks to dismiss the original and amended motions of the lead defendants on the ground that they were not timely filed within the requirements of 28 U.S.C. § 1867(a),[6] nor were the motions supported by affidavit setting forth facts as required by § 1867(d)[7] which, if true, would constitute a substantial failure to comply with the Jury Selection Act.

A separate and discrete issue is whether the defendants have filed motions which qualify under Rule 12(b)(1) and (2)[8] to raise prior to trial defenses and objections to defects in the institution of the prosecution or defects in the indictment which had to be

---

**5.** Defendants in all other cases consolidated in this action have filed similar motions and supporting affidavits, with one exception: the motion of defendant James Atchley in CR 80–11 N which was filed on December 3, 1980, twelve days after his initial appearance with counsel. No affidavit was attached to the motion, which was dismissed in a bench ruling on December 18. No motion to reconsider this ruling has been filed. As to this defendant, we conclude that, not only were the requirements of 28 U.S.C. § 1867 not complied with, but, furthermore, the motion was waived under Rule 12(f).

**6.** § 1867. Challenging compliance with selection procedures

(a) In criminal cases, before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier, the defendant may move to dismiss the indictment or stay the proceedings against him on the ground of substantial failure to comply with the provisions of this title in selecting the grand or petit jury.

**7.** (d) Upon motion filed under subsection (a), (b), or (c) of this section, containing a sworn statement of facts which, if true, would constitute a substantial failure to comply with the provisions of this title, the moving party shall

be entitled to present in support of such motion the testimony of the jury commission or clerk, if available, any relevant records and papers not public or otherwise available used by the jury commissioner or clerk, and any other relevant evidence. If the court determines that there has been a substantial failure to comply with the provisions of this title in selecting the grand jury, the court shall stay the proceedings pending the selection of a grand jury in conformity with this title or dismiss the indictment, whichever is appropriate. If the court determines that there has been a substantial failure to comply with the provisions of this title in selecting the petit jury, the court shall stay the proceedings pending the selection of a petit jury in conformity with this title.

**8.** (b) Pretrial Motions. Any defense, objection, or request which is capable of determination without the trial of the general issue may be raised before trial by motion. Motions may be written or oral àt the discretion of the judge. The following must be raised prior to trial;

(1) Defenses and objections based on defects in the institution of the prosecution; or
(2) Defenses and objections based on defects in the indictment or information . . . .

filed within time limits provided by subsection (c) of Rule 12.[9] The government contends that defendants, by their failure to timely file 12(b) motions, have waived grounds of challenge even though they may be of constitutional proportion, and so no basis exists for the court to grant relief from the waiver. The defendants contend that they did not file 12(b) motions out of time but that even if they did, their motions should nevertheless be heard since they raise substantial constitutional issues, the cases are still in a pretrial state, none of the cases having been calendared for trial on the merits, and a hearing on such motions will neither prejudice the government nor frustrate the orderly calendaring of cases for trial.

We first address the statutory requirements imposed by the Jury Selection Act, particularly 28 U.S.C. § 1867(a) and (d), and next consider the parameters of Rule 12 in the context of constitutional challenges to the jury selection process.

## I. JURY SELECTION ACT

■ The settled law of the Fifth Circuit is that the time provisions of § 1867(a) and (d) must be strictly construed, and that ordinarily failure to challenge the proceedings on the ground of substantial failure to comply with the Act bars a defendant from raising the point. *United States v. Merlino,* 595 F.2d 1016, 1020 (5 Cir. 1979), *cert. denied,* 444 U.S. 1071, 100 S.Ct. 1014, 62 L.Ed.2d 752 (1980); *United States v. Kennedy,* 548 F.2d 608, 613 (5 Cir.), *cert. denied,* 434 U.S. 865, 98 S.Ct. 199, 54 L.Ed.2d 140 (1977); *United States v. Hill,* 480 F.Supp. 1223, 1227 (S.D.Fla.1979).

It is to be noted that in *Merlino* and *Kennedy,* and in *United States v. De Alba-Conrado,* 481 F.2d 1266 (5 Cir. 1973), challenges were first raised at or after voir dire examination. Nevertheless, it is apparent that the Fifth Circuit in *Kennedy* hinted that unusual circumstances might constitute a reasonable basis for excusing strict compliance with the seven-day rule.

*Absent some indication from particular circumstances that counsel could not reasonably have been expected to comply with the procedural prerequisites to a statutory challenge to the jury,* the claim under the Act will be forfeited by noncompliance. (Emphasis added).

*Kennedy,* at 613. This statement was alluded to by way of dicta in *United States v. Hawkins,* 566 F.2d 1006 (5 Cir.), *cert. denied,* 439 U.S. 848, 99 S.Ct. 150, 58 L.Ed.2d 151 (1978), where the court stated, in reference to *Kennedy:*

At the same time, we concluded, based on the express language of the statute, "that Congress left no room for ad hoc review of the usefulness of compliance" with the procedural requirements. Id. Arguably, the statute can be interpreted as impliedly excusing compliance with the timeliness requirement where, as here, a potential irregularity in the jury selection process is known to the trial judge and the prosecutor but is unknown to the defendant.

The district court, in *Hill,* regarded the expressions of *Kennedy* as justification for holding "it was never the intent of Congress to preclude the filing of a motion such as in the instant case ..., based on these particular [factual matters presented in *Hill*] circumstances and on the circumstances [presented in *Hill*] of counsel ...." 480 F.Supp. at 1228. *Hill* adhered to the proposition that the "legislative intent of utilizing § 1867 as a means for discouraging spurious challenges filed for dilatory purposes should be recognized.... [But] in the instant case ... the challenge is neither spurious nor the purpose dilatory." *Id.* The court found further from the particular circumstances presented that counsel could not have reasonably been expected to comply with the procedural prerequisites to the statutory challenge under the Act within the seven-day period and that an exception of reasonableness was thus imported to the

**9.** (c) Motion Date. Unless otherwise provided by local rule, the court may, at the time of the arraignment or as soon thereafter as practica-ble, set a time for the making of pretrial motions or requests and, if required, a later date of hearing.

Act. The plain implications of *Kennedy* and *Hawkins* convince us that an exception of reasonableness is recognized to allow laxity under certain circumstances as proper to comply with the statutory requirement.

■ It is to be noted that the Jury Selection Act provides that "[t]he procedures prescribed by [§ 1867] shall be the exclusive means by which a person accused of a Federal crime . . . may challenge any jury on the ground that such jury was not selected in conformity with the provisions of this title." § 1867(e). Notwithstanding the unequivocal provisions of the Jury Selection Act, it is clear that strict compliance with the time provisions of § 1867 is not jurisdictional in the sense that a district court loses power to act upon a challenge not filed within the seven-day period regardless of the circumstances. We hold that a showing of reasonableness, or exigent or compelling circumstances, authorizes the district court, in the exercise of sound discretion, to entertain a challenge filed out of time. ·

■ Since compliance with § 1867(a) and (d) is not jurisdictional in the strict sense of the word although the requirements of timeliness must be stringently observed, courts may, upon an adequate showing of reasonableness, or exigent and compelling circumstances, grant motions filed beyond the seven-day period which raise failure to substantially comply with the Jury Selection Act. With respect to the real estate defendants, it is clear that even prior to indictment and arraignment they engaged investigators to make intensive study of the clerk's jury records, which entailed examining, and closely inspecting, several thousand juror questionnaires. The magistrate assigned to the real estate defendants' case extended the time for filing of motions to quash their indictment, and their motions were filed within the deadline established. A different situation prevails as to the garbage case and other defendants

who made their initial filings alleging substantial departures from the Act on and after August 28. It is evident that prior to August 18—ten days before the garbage case defendants filed their motion to dismiss—all that the garbage case or other defendants could have made would be no more than a paper record, unsupported by factual averment, inasmuch as they had no knowledge regarding the information developed on behalf of the real estate defendants. Moreover, the circumstances indicate that the garbage case defendants, by withholding possibly unfounded motions, acted reasonably and prudently. Prominently contributing to this conclusion is the fact that the magistrate strongly indicated his disapproval of any motion which might challenge an indictment on the ground of illegalities in grand jury composition unless it was factually supported. The magistrate's position to this effect is clearly reflected in the transcript of his proceeding. An instance of a judicial officer discouraging utilization of a procedure otherwise available to defense counsel, may, we think, be properly regarded as a circumstance *sui generis* adequately justifying reasonable delay as a prudent course. It is the function of courts not to ignore realities disclosed by the record, although they may not have occurred with special design or intent to injure but which nevertheless affect counsel in the management of their clients' cases. Suffice it to say that from all circumstances shown, we hold that equitable considerations present here excuse the garbage case defendants from strict compliance with the time requirements of § 1867(a) and (d), and that they acted with reasonable diligence in raising the statutory challenges. Concerning other defendants in the consolidated case, most of whom are represented by the Atlanta Public Defender's office, actual notice of the grand jury challenge was received by this office on September 30, and motions were filed soon thereafter.[10]

10. It will serve no useful purpose to detail the specific dates of motions and affidavits filed by the remaining defendants in the consolidated hearing. As later held, all defendants are entitled to be heard on all challenges of constitu-

tional magnitude. Only in CR 80–08 G, *United States v. Robert A. Snowden,* was a continuance granted by Judge O'Kelley because of the late filing of motions to dismiss by certain defendants who contended that they had filed

## II. *RULE 12(b) MOTIONS*

■ Initially we judged the December amended motions of all defendants by the stringent time requirements mandated by § 1867 with respect to the filing of motion and supporting affidavit and concluded that all defendants knew or by the exercise of reasonable diligence should have known of the additional grounds of jury challenge at least several months prior to the filing of the December amendments. Therefore, it was our view that the December amendments should be disallowed as untimely under the Jury Selection Act and that Rule 12(b), F.R.Crim.P., did not protect defendants in the late filing of such amendments. Motions to reconsider this aspect of the court's ruling were timely filed and upon reflection, the court adheres to the view that the December amendments to dismiss filed by the defendants in this case, together with supporting affidavits, did not satisfy the strict requirements of § 1867(a) and (d) and, to that extent, is content to rely upon the reasoning originally stated, i. e., that there was no compelling circumstance or exigent condition which would serve to extend from August 18, or August 28, 1980, to December 1980 the time allowed for the filing of additional grounds of challenge, and, if only statutory grounds were alleged, the December amendments to dismiss would be disallowed.

Nevertheless, the court has reconsidered the applicability of Rule 12(b) to all cases before it and now concludes that the December amendments which raise constitutional claims of serious import that the procedures for selection of grand and petit jurors in the Northern District of Georgia violate the United States Constitution by failing to provide an adequate cross section of certain cognizable classes of citizens in the community, the claim being that the procedures utilizing the voter registration lists of the several counties comprising the judicial district, result in the underrepresentation, inter alia, of blacks, blue collar and service workers, and persons having less than a high school education, and the over-representation of white collar workers, the employed and persons having a high school education or better, are timely. It is our view that at least to the extent that these claims are of constitutional magnitude, the motions asserting them should be allowed, notwithstanding the lateness of filing. Our ruling in no way alters the trial schedule of the original motions to dismiss, set for January 5, 1981, and only requires the allowance of the garbage case, real estate and other defendants in the consolidated hearing to participate and rely upon constitutional grounds which have been previously bifurcated by this court from the evidentiary hearing to be presently conducted, and for the bifurcation or reservation of constitutional issues to be determined at a later date.

A brief analysis of the law relating to Rule 12(b) is in order. As originally adopted in 1946, Rule 12(b)(2) provided that defects and objections based on defects in the institution of the prosecution or in the indictment "may be raised only by motion before trial." Subsection (b)(3) provided "the motion shall be made before the plea is entered but the court may permit it to be made within a reasonable time thereafter." The motion had to include all defenses then available to the defendant, and failure to present an objection constituted waiver thereof, although the court for cause shown could grant relief from the waiver. In 1975, Rule 12(b) was amended to provide specifically that five classes of motions *must* be raised prior to trial, and defenses and objections based on defects in the institution of the prosecution or in the indictment comprise the first two classes. The amended rule provides in subsection (c) for a motion date, to be determined by local rule or by the court as may be set at time of arraignment or as soon thereafter as may

---

written motions to dismiss on grounds of challenge to the grand jury on the original indictment. After a superseding indictment was returned against them, they orally moved to adopt all previously submitted written motions, which allegedly was allowed by the magistrate. Since Judge O'Kelley had entered an order of continuance prior to our hearing of January 5, 1981, we nevertheless include CR 80–08 G in the present consolidated proceedings.

be practicable for the hearing. See notes 8 and 9 *supra*. The amended rule retains the provision that failure by a party to raise objections which must be made prior to trial will operate as a waiver if not filed within the time provided by subsection (c), or prior to any extension thereof made by the court, but the court for cause shown may grant relief from the waiver.[11]

It is evident that while any motion attacking the legality of the grand jury composition under amended Rule 12 *must* be made before trial, the time for filing such motion was somewhat enlarged since it did not have to be filed before the plea or at arraignment but within such time "as soon as practicable" as the court may allow, either initially or by subsequent extension. The purpose of Rule 12 for having pre-trial defenses and objections of this type, even in situations requiring the taking of evidence, to be disposed of in advance of trial and without frustration of court calendars and inconvenience to jurors, witnesses and lawyers, is adequately served by liberal application of timeliness, especially where constitutional rights of defendants are implicated in the motion. Indeed, from briefs of counsel and our own research, we have found no case which so restricts Rule 12(b) motions in the stringent terms mandated by 28 U.S.C. § 1867(a).

We therefore hold that the strictures imposed by § 1867(a) and (d), as stated in the statute itself to constitute the exclusive method by which defendants in criminal cases may challenge substantial compliance with the Jury Selection Act, relate to those challenges of defects and irregularities which constitute substantial statutory departures, whether committed by court personnel or by judges in the administration of the jury selection plan or application of the

Act, and that § 1867 does not reach or necessarily govern constitutional challenges to the selection of grand and petit jurors. Indeed, to give § 1867 such a broad reading would be to curtail sharply and unduly valued constitutional rights which the decisions of the United States Supreme Court have sought to maintain, short of an unequivocal, unambiguous waiver of right and without the presence of any factual basis for granting relief from waiver of such constitutional claim. The Jury Selection Act, which was adopted March 27, 1968, neither by its terms nor in the legislative history fairly implies that a curtailment of constitutional rights was intended, and we decline to give § 1867(a) and (d) such a strained interpretation.

There are cases which hold that a challenge to the jury not made until the day of trial comes too late, whether it is treated as a failure to comply with § 1867(a) or with Rule 12. For example, in *United States v. Geelan*, 509 F.2d 737 (8 Cir. 1974), *cert. denied*, 421 U.S. 999, 95 S.Ct. 2395, 44 L.Ed.2d 666 (1975), the Eighth Circuit held a grand jury challenge first made on opening day of trial was disallowed as untimely. It is interesting that the Court nevertheless addressed the merits of the alleged constitutional claim by finding young adults 18–20 years of age do not constitute a cognizable group whose exclusion from the jury rolls amounted to an error of constitutional dimension.[12] Similarly, *Brooks v. United States*, 416 F.2d 1044 (5 Cir. 1969), *cert. denied*, 400 U.S. 840, 91 S.Ct. 81, 27 L.Ed.2d 75 (1970), was an appeal from a conviction in the Northern District of Mississippi, in which the Fifth Circuit upheld the trial judge's discretion denying as untimely defense objections made on opening day of trial to quash the indictment and petit jury venire on the ground that the district's jury

---

**11.** (f) Effect of Failure to Raise Defenses or Objections. Failure by a party to raise defenses or objections or to make requests which must be made prior to trial, at the time set by the court pursuant to subdivision (c), or prior to any extension thereof made by the court, shall constitute waiver thereof, but the court for cause shown may grant relief from the waiver.

**12.** In footnote 7, the *Geelan* court observed that the Jury Selection Act, 28 U.S.C. § 1861 et seq. though prohibiting discrimination according to race, color, religion, sex, national origin or economic status in the selection of jurors, does not prohibit age discrimination. 509 F.2d 741 n.7.

selection system failed to produce an acceptable number of females for jury service. Then-District Judge Claude Clayton, at arraignment on August 3, advised defense counsel that defendant had 15 days within which to file pretrial motions; no challenge was made until September 25, when the case was called for jury trial. Judge Clayton opined that, considering the length of time since arraignment, the motion was filed primarily to obtain a continuance.

Many cases, of course, followed the landmark holding in *Davis v. United States*, 411 U.S. 233, 93 S.Ct. 1577, 36 L.Ed.2d 216 (1973), a decision on which government counsel has strongly relied here. But *Davis* is readily distinguishable since the defendant Davis made no attack upon the legality of the grand jury which indicted him until he made a motion to vacate sentence under 28 U.S.C. § 2255, filed almost three years after his conviction. The Court declared that the "necessary effect of the congressional adoption of Rule 12(b)(2) is to provide that a claim once waived pursuant to that Rule may not later be resurrected, either in the criminal proceedings or in federal habeas, in the absence of the showing of 'cause' which that Rule requires." *Davis*, at 242, 93 S.Ct. 1582–83.[13] The Court emphasized that both the trial and appellate courts had positively determined that the issue of discrimination in grand jury selection had not been raised by the defendant prior to trial.[14]

This brings us to whether all defendants in this consolidated hearing have waived the right to raise constitutional challenges contained in their most recent motion. We are still in the pretrial stage, concerned with preliminary matters which attack the procedures used by the court personnel in selecting grand and petit jurors and by judges charged with race and sex bias in the selection of grand jury forepersons and deputy forepersons. No trial date for these cases has been set, and none will have to be continued as a result of these present proceedings.[15] The grounds of challenge appear to be substantial, and may not be characterized as spurious or interposed merely for purposes of delay.

Other Rule 12(b) considerations should be placed in correct perspective, especially because they are not seriously disputed, if at all, by the prosecution. The garbage case defendants filed their original motion to dismiss on August 28, 1980. Magistrate Forrester held a show-cause hearing on September 10 as to why the filing of the first motion was not in violation of the magistrate's timetable for resolving pretrial matters. Counsel for defendants and the government submitted memoranda and letters directed to this issue through October 14. Meanwhile, counsel for garbage case defendants, on September 24, met with legal and statistical experts with a view of employing personnel to make a compositional study of the pertinent jury records. On October 2, the real estate defendants, and perhaps other indictees, employed the National Jury Project to make such study. Since the real estate defendants alone had been previously permitted to view the rec-

---

**13.** The Supreme Court has since extended the waiver doctrine, embraced within Rule 12 in federal prosecutions, to habeas corpus cases of state-convicted defendants whenever state courts have ruled there was procedural waiver under state law. *Francis v. Henderson*, 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976).

**14.** Since the original trial of Clifford Davis occurred prior to implementation of the Jury Selection and Service Act, 28 U.S.C. § 1861 et seq., the Supreme Court was not concerned with its application. Nevertheless, the Court emphasized the effect of Rule 12(b) as applicable to all direct federal prosecutions.

Rule 12(b)(2) promulgated by this Court and, pursuant to 18 USC § 3771 [18 USCS § 3771], "adopted" by Congress, governs by its terms the manner in which the claims of defects in the institution of criminal proceedings may be waived. See *Singer v. United States*, 380 U.S. 24, 37, 85 S.Ct. 783 [791], 13 L.Ed.2d 630 (1965). Were we confronted with an express conflict between the Rule and a prior statute, the force of § 3771, providing that "[a]ll laws in conflict with such rules shall be of no further force or effect," is such that the prior inconsistent statute would be deemed to have been repealed.
411 U.S. at 241, 93 S.Ct. at 1582, 36 L.Ed.2d at 224.

**15.** *But see* note 10 *supra.*

ords, Magistrate Forrester was requested, and on October 16 ordered, defense counsel as well as personnel from the National Jury Project to have access to the relevant records. The government never took a firm position of acceding to or opposing this action of the magistrate. The matter first came to our attention in this state of the record.

Although further comment may be unnecessary, we note that several cases have elucidated upon the relief for "cause" exception in Rule 12. Obviously, it is a matter left to the discretion of the judge. *Davis, supra,* 411 U.S. at 245, 93 S.Ct. at 1584. Usually, this question has arisen in a posttrial setting. In *United States v. Williams,* 544 F.2d 1215 (4 Cir. 1976), the Fourth Circuit ruled that no "cause" was shown by a defendant who had been indicted for first degree murder on a military reservation and was convicted of second degree murder. After the conviction was affirmed on appeal, the defendant filed a § 2255 motion to vacate sentence, alleging for the first time that blacks had been deliberately excluded from the federal grand jury which indicted and the petit jury which convicted him. The district court dismissed summarily, relying on *Davis.* The appeals court first reversed, stating that the defendant should have had an opportunity to show "good cause" why he should be excused from Rule 12's waiver provision. The district court, after an evidentiary hearing, held that defendant had not been prejudiced on account of jury composition since there had been black representation on the petit jury and the jury selection procedures were otherwise proper. The Fourth Circuit agreed with this holding, acknowledging that though actual prejudice may be difficult to demonstrate in most cases, it is consistent with the notion that relief from Rule 12(b)(2) waiver is "an exercise of an extraordinary power" and must be regarded as an exception to the rule. *Id.* at 1218. *See Throgmartin v. United States,* 424 F.2d 630 (5 Cir. 1970.)

If it were here necessary to articulate relief from a Rule 12(b) waiver based on cause, presumed, if not actual, prejudice must be deemed to exist on the basis of facts, which, if shown to be true, would violate established constitutional principles that legally cognizable groups in the jury-eligible population may not be permissibly excluded from the jury selection process. The present defendants are an array of blacks, indigent whites, and other indictees representing wide-ranging economic status. So if their motion to challenge indictments on constitutional issues were disallowed, the effect of such a ruling would leave the defendants, if their positions are not mistaken, without a remedy for the government's violation of constitutional rights. *See United States v. Jones,* 322 F.Supp. 1110 (E.D.Pa.1971).

It is accordingly

ORDERED

That except in one case, CR 80–11 N, defendant James Atchley, the government's motions to dismiss the original and amended motions (except the December amendments) of the defendants in this consolidated action which challenge the deficiencies of the selection of grand and petit jurors in the Northern District of Georgia on statutory and constitutional grounds are denied and the government's motion to dismiss Atchley be and the same hereby is sustained.

That the government's motion to dismiss on statutory grounds the amended motions filed in December be and the same hereby is granted, but that, as to the constitutional claims raised in those motions, the government's motion is denied.

That in accordance with rulings made at the pretrial conference, Rule 17.1, F.R. Crim.P., the issues raised by the original motions challenging substantial departures in the application of the Jury Selection Act and the administration of the jury selection plan adopted by the Northern District of Georgia together with the first-raised constitutional claims of racial and sex bias on the part of the sitting judges and the selection of grand jury forepersons and deputy forepersons and gender discrimination in the granting of excuses for jury duty be set

for separate hearing in this consolidated action commencing January 5, 1981.

## III.

### DISPOSITION OF MERITS

In a nine-day evidentiary hearing beginning January 5, 1981, the court received evidence consisting of voluminous exhibits, live testimony, depositions and heard extended oral argument of counsel. All parties having since presented proposed findings of fact and legal memoranda, the court resolves issues submitted at the present hearing by incorporating herein findings of fact and conclusions of law.

It is helpful to restate the present contentions of the parties. Defendants' most prominent contention is that the sitting district judges of the Northern District of Georgia have impermissibly discriminated against blacks and women in the appointment of grand jury forepersons and deputies from January 1970 through February 1980, contrary to the fifth and sixth amendments to the United States Constitution. In addition to this constitutional claim, defendants urge that the indictments against them should be dismissed because of a variety of irregularities or failures resulting in substantial noncompliance with the Jury Selection and Service Act, as well as the district's plan for the selection and service of grand and petit jurors which was adopted by the district judges and approved by the Reviewing Panel of the Fifth Circuit. The prosecution's response, initially, is that the offices of grand jury foreperson and deputy in the federal prosecution system have no constitutional significance; but if this position is not well taken, it is claimed that defendants failed to make out a prima facie case of race or sex discrimination; and finally that any prima facie case of such discrimination was effectively rebutted by affirmative and unimpeached evidence offered by the prosecution. As for claims based upon alleged noncompliance with the statute and the district's plan pertaining to the selection and service of grand and petit jurors, the government argues that court personnel substantially complied with jury selection process mandated by law in all material respects and that the few deviations disclosed by the evidence were minor, only technical in nature, and of *de minimus* effect, considering the size and scope of the tasks imposed upon a large judicial district and the demonstrated diligence and good faith exhibited by court personnel in administering the plan.

We shall briefly set forth the essential, yet largely uncontradicted, evidence regarding the constitutional claim of the foreperson issue before entering into a detailed discussion of the evidence and law concerning the challenges of noncompliance which defendants make based upon the Act and the district's plan.

(a) *The grand jury foreperson constitutional claim.*

The Northern District of Georgia, comprising 46 counties, has four statutorily created divisions: Atlanta, Gainesville, Newnan and Rome. Grand juries are regularly convened at Atlanta; each grand jury ordinarily serves for 18 months, and there is usually more than one grand jury sitting at any particular time. Veniremen, or panel members, are proportionately drawn from the separate qualified wheels at the four divisions. Prior to July 1974, 36 persons— 20 from the Atlanta Division, 8 from the Rome Division, and 4 each from the Gainesville and Newnan Divisions—were customarily summoned for grand jury duty. Thereafter, the number of veniremen was increased to 50—33 persons are chosen from the Atlanta Division, 4 from Gainesville, 5 from Newnan and 8 from Rome.

During the relevant time period, 42 different grand juries for the district were empaneled, each consisting, as provided by law, of no more than 23 members. During this entire period, 43 foreperson appointments were made.[16] The duty of appoint-

---

**16.** The death of the original foreperson of the grand jury empaneled January 7, 1976, caused the appointment of a successor foreperson since the deputy foreperson of that grand jury

ing forepersons and deputies was rotated among eight then sitting judges.[17] Of the 43 forepersons selected, only two were black.[18] Two white females were selected foreperson by Judge Freeman. Regarding deputies, there were three black females and 13 white females.[19]

The record shows that the aggregate composition of all empaneled grand juries from January 1970 to February 1980 consisted of a total of 948 jurors, of whom 514 (54%) were white males, 288 (30%) were white females, 68 (7%) were black females and 49 (5%) were black males.[20] As regards the composition by sex, 579 (61%) were males and 369 (39%) were females. As for race, 802 (85%) were white, 117 (12%) were black and 29 (3%) were of unknown race.[21]

Defendants offered James Michael O'Reilly, an expert social scientist, who testified that he ascertained the jury-eligible population (18 and over) for the 46 counties in the Northern District of Georgia based on the 1970 United States Census, which he adjusted by 1978 Georgia estimates, arriving at a jury-eligible population of 1,409,200 whites and 312,047 blacks. He stated it was recognized by census and other population authorities that the 1970 United States official census, on a nation-wide basis, undercounted whites by 1.9% and blacks by 7.7%. Applying these national rates of undercount to each race, O'Reilly calculated that in 1978 the judicial district had a white jury-eligible population of 1,439,642 and a black jury-eligible population of 340,464 (19.1%). Using the same formula, O'Reilly ascertained for the Atlanta Division alone a white jury-eligible population of 942,258 and a black jury-eligible population of 269,-896 (22.3%).[22] O'Reilly compared the percentage of blacks and whites in the jury-eligible population for the entire district with the percentage of blacks and whites appointed as forepersons. Blacks represented only 4.7% of total foreperson selections (2 blacks out of 43 forepersons). Compared to the 19.1% district black population, O'Reilly determined an absolute disparity of 14.4% and a comparative disparity of 75.7%. Use of chi square ($X^2$) formula yielded .016, which means that there was one chance out of 63 that black underrepresentation as forepersons was the result of chance, and hence black underrepresentation as forepersons was due to some factor other than chance. With respect to sex, O'Reilly compared the district female population (51.2%) with the percentage of female forepersons (4.7%), being 2 females out of 43, and calculated this to be an absolute disparity of 46.5% and a comparative disparity of 90.9%. From a statistical viewpoint, O'Reilly testified that the odds of so few females serving as forepersons as a matter of chance were approximately 1 in 900 million. No calculations were made by O'Reilly as to the blacks

---

withdrew her name from consideration as succeeding foreperson. See Govt.Exh. 116.

**17.** Judge Edenfield empaneled 6 grand juries, Judge Moye 10, Judge Freeman 10, Judge O'Kelley 5, Judge Hooper 7, Judge Hill 2, Judge Shoob 1 and Judge Vining 1.

**18.** Both black forepersons were males. One was appointed by Judge Moye; the other was originally appointed by Judge Edenfield as deputy; he later assumed the duties of foreperson by agreement between himself and the appointed foreperson with the approval of Judge Edenfield.

**19.** Judge Freeman appointed 1 black and 4 white female deputies; Judge Moye appointed 2 black and 4 white females. Judge Hooper appointed 3 white females, and Judges Shoob and Vining each appointed 1 white female deputy.

**20.** The race of 16 males and 13 females could not be determined.

**21.** See joint Exh. 124 to 165 and Govt.Exh. 1 to 42. In case of conflicts between government exhibits and questionnaires in joint Exh. 124 to 165, we relied upon the original source material. When available, "race and sex" reports prepared by the clerk's office and found in certain joint exhibits were relied upon. When not affirmatively indicated, gender assumptions were made, when reasonable to do so, based on individual's name.

**22.** O'Reilly made no such separate calculations for the Gainesville, Newnan, and Rome Divisions.

and women who were appointed as deputies.[23]

O'Reilly's statistical calculations were essentially unimpeached by Dr. Charles Wang, the prosecution's expert, who criticized O'Reilly's statistical methodology yet did not take serious issue with O'Reilly's conclusions.

Defendants also offered "theoretical evidence" through Dr. John McConahay, of Duke University, who testified as to group dynamics. His opinion was that though the influence of a leader of a group of less than ten may be minimal, as the size of the group increases, the influence of the leader is also likely to increase. McConahay drew a distinction between an "imposed leader," i. e., one appointed from an outside source, and the "emergent leader," i. e., one who naturally assumes a position of leadership within the group. This expert's opinion was that the influence of an imposed leader, as one appointed by a judge to be grand jury foreperson, is apt to be greater than that of other members of the grand jury. Since the foreperson might be perceived as having more expertise if chosen by the judge, he opined that a judge-appointed foreperson would likely exercise considerable influence over the grand jury's deliberations. This expert expressed no opinion as to the role of the deputy foreperson, other than that the position called for less of a leadership role. On cross-examination, McConahay acknowledged that the longer and more frequently the same group meets, the greater is the chance that a natural leader, which he termed a "socio-emotional leader," might emerge with lessening influence of the appointed leader. He readily conceded that under such circumstances an appointed foreperson might well have less influence over a period of time. This witness acknowledged that he had never served on a federal grand jury, had no knowledge of how often a particular grand jury might meet or how long it remains in session, and knew nothing of the manner in which it transacts business.

The defense offered United States District Judge Vining, who was allowed to express his views based upon six years' experience as district attorney in the Georgia state courts in dealing with state grand juries which selected their own forepersons in accordance with Georgia law.[24] Judge Vining's observations as to the operation of state grand jurors, selected from a single county, were objected to by the prosecution; the court overruled this objection and admitted the judge's testimony as a lay opinion under Rule 701 helpful to the court sitting as the trier of fact. Judge Vining, who had observed 40 state grand juries in operation, expressed the view that the foreperson should be a strong person who is not arbitrary yet mindful of the responsibility for directing the session. He characterized the foreperson as a "vital cog" in the grand jury "to avoid it going off in different directions." On cross-examination, the judge stated that Georgia grand juries drawn from a single county serve for two-and six-month periods. While he ordinarily withdrew from the grand jury room during deliberations on an indictment, many district attorneys remain throughout. His experience was that the foreperson of a grand jury did not ordinarily cast a vote in indictments but he usually saw that the business was handled with dispatch. For example, Judge Vining recalled one grand jury, in a four-day session, returning 300 indictments.

All eight appointing judges testified that in selection of forepersons and deputies they examined and relied upon the juror questionnaires of persons summoned for grand jury duty, and they made no independent investigation of their qualifications. Except in rare instances, the appointing

---

23. If deputy forepersons and forepersons were treated together, the results of the statistical analysis, especially by sex, would be less dramatic than those on which O'Reilly based his conclusions. The prosecution failed to show the result of an analysis combining deputy forepersons with forepersons.

24. The judge has empaneled only one federal grand jury and, of course, knew nothing of its deliberative processes.

judge did not personally know the individuals he selected as forepersons and deputies. The essence of the judges' testimony was that in making selections they were guided chiefly by one's education and character of employment, and that they endeavored to select forepersons and deputies who had apparent qualifications to serve in those capacities. All of the judges categorically denied that considerations of sex or race entered into their selection, and that they particularly did not discriminate against blacks or women in their appointments. Practically all of the judges expressed the view that the foreperson should be one who had the capacity to conduct and preside

over meetings of the grand jury, and able to perform duties largely of an administrative character. On cross-examination most judges conceded that persons on the grand juries other than the individuals they chose as forepersons and deputies might have been as well qualified as the forepersons and deputies who were appointed.

The foregoing summary of the evidence is adequate to demonstrate that the issue of sex and race discrimination in the selection of forepersons and deputies is indeed a question of major constitutional import, provided the office of a federal grand jury foreperson has constitutional significance.[25]

**25.** This precise question remains undecided by any appellate court upon detailed review of federal grand juries selected under Rule 6(c), F.R.Crim.P., pursuant to 28 U.S.C. § 1861 et seq., and a plan of a federal district court approved by the Circuit reviewing panel as distinguished from the operation of state grand juries. It is safe to assume the method of jury foreperson appointment, type of grand jury selection, the number of jurors comprising the grand jury, duration of service, and duties apart from consideration of indictments widely vary among the states of the Union, if not among those within the Fifth Circuit.

The only case directly holding that constitutional significance attaches to the position of foreperson of federal grand juries is a district court opinion, *United States v. Jenison*, 485 F.Supp. 655, 661 (S.D.Fla.1979). That holding was premised on a view that the Supreme Court in *Rose v. Mitchell*, 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979), which, although reversing the Court of Appeals, "had no disagreement with the Sixth Circuit's conclusion that 'proof of discrimination in the selection of a grand jury foreman mandates the same remedy as does proof of discrimination in the selection of the grand jury.'" *Jenison* at 661. *Jenison* found the duties of the state grand jury foreperson indistinguishable from his federal counterpart. *Id.* Sitting as a district judge by designation, Circuit Judge Hatchett found statistical evidence pertaining to gross underrepresentation of blacks as forepersons (14.6% absolute disparity, 88% comparative disparity), and of women as forepersons (43% absolute disparity and 81% comparative disparity). All of the sitting judges in the Southern District of Florida testified that they made their selections of forepersons and deputies without regard to race or sex. It seems critical to the successful rebuttal of the defendants' prima facie case that the court ruled that "[i]t is within the [federal] judge's discretion to appoint the person he deems *most* qualified to the office of

foreperson. See, Rule 6(c), Fed.R.Cr.P." *Jenison* at 666 (emphasis original). *Rose v. Mitchell, supra,* assumed, without deciding, that the foreperson of Tennessee's system, which permitted the grand jury foreperson to be appointed by the judge from the public at large and not from the veniremen chosen at random as were other members of the grand jury, had constitutional significance. Since the Sixth Circuit Court decision holding the Constitution was violated was reversed on appeal, the precedential value of that holding, at least as it appertains to the federal grand jury system, remains debatable. We are mindful that on two occasions, the Fifth Circuit, in two state prosecution cases, had *assumed* that "the right to a grand jury selected without regard to race applies fully when only the selection of the foreperson is at issue rather than the selection of the entire grand jury venire." *Williams v. State of Mississippi*, 608 F.2d 1021, 1022 (5 Cir. 1980) (construing Mississippi law). The same assumption was made in *Guice v. Fortenberry*, 633 F.2d 699, 703 n.6 (5 Cir. 1980) (interpreting Louisiana law).

Our reading of these cases, save for the *Jenison* decision, is that appointment by a judge under Rule 6(c) of a foreperson and deputy foreperson in a federal grand jury drawn randomly and from a fair cross-section of the community, pursuant to the mandates of 28 U.S.C. § 1861 et seq., and an approved district court plan, presents an issue of constitutional dimension which remains to be fully explicated and authoritatively decided by appellate authority for the guidance of district judges.

Assuming constitutional significance of the position, defendants rely primarily on *Castaneda v. Partida*, 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977), and *Rose v. Mitchell, supra,* as establishing the standard to be applied in determining whether an adequate showing of discrimination has been made. Although these cases were brought under the Equal Protection Clause of the fourteenth

It is a well-settled principle that courts should not decide a case on constitutional grounds when it can be resolved on statutory and general law grounds. This doctrine was emphasized in *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936), which stated:

> The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of. This rule has found most varied application. Thus, if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter. *Siler v. Louisville & Nashville R. Co.,* 213 U.S. 175, 191 [29 S.Ct. 451, 454, 53 L.Ed. 753]; *Light v. United States,* 220 U.S. 523, 538 [31 S.Ct. 485, 488, 55 L.Ed. 570].

*Id.* 297 U.S. at 347, 56 S.Ct. at 483 (Brandeis, J., concurring, joined by Justices Stone, Roberts and Cardozo).

The Supreme Court has unswervingly held to this approach in resolving issues based upon both constitutional and statutory grounds. The rule was recently reaffirmed in *Califano v. Yamasaki,* 442 U.S. 682, 692, 99 S.Ct. 2545, 2553, 61 L.Ed.2d 176, 187 (1979), when the Secretary of the Department of Health, Education, and Welfare (HEW), as petitioner, sought to recoup erroneous overpayment made to social security beneficiaries. The recipients sued in federal court on claims that the Secretary's recoupment procedures were contrary to the recoupment statute, 42 U.S.C. § 404, and the Due Process Clause of the fifth amendment. Holding that the case was capable of resolution on statutory grounds, Justice Blackmun, writing for the Court, pretermitted consideration of the Due Process claim by stating:

> A court presented with both statutory and constitutional grounds to support the relief requested usually should pass on the statutory claim before considering the constitutional question. *New York City Transit Authority v. Beazer,* 440 U.S. 568, 582–583, and n.22, 99 S.Ct. 1355 [1364 n.22] 59 L.Ed.2d 587 (1979); *United States v. CIO,* 335 U.S. 106, 110, 68 S.Ct. 1349 [1351] 92 L.Ed. 1849 (1948); *Ashwander v. TVA,* 297 U.S. 288, 347, 56 S.Ct. 466 [483], 80 L.Ed. 688 (1936) (concurring opinion).

*Id.* 442 U.S. at 692, 99 S.Ct. at 2553.

Since it is our view that the instant cases may be disposed of on grounds based upon the Jury Selection and Service Act, the district's judicially approved plan, and general law principles, we find it inappropriate to address the constitutional claims that the positions of forepersons and deputy forepersons of federal grand juries have constitutional significance where such grand juries are selected and drawn strictly in accordance with the statute and the district's plan. Similarly, we pretermit defendants' alternative constitutional claims that persons over 70 years of age are a "cognizable group," whose exclusion offends the Constitution and that optional excusals of females, and not males, having legal custody of children under 10 years of age amount to unconstitutional gender discrimination.

(b) *Failure to comply with the Jury Selection and Service Act and the District Court's approved Plan.*

Our analysis begins with the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861 et seq., which was enacted to effectuate definite policies clearly expressed within the Act itself:

> It is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community and in the district or division wherein the court convenes. It is further

amendment, they are applicable here since "if a classification would be invalid under the Equal Protection Clause of the Fourteenth Amendment, it is also inconsistent with the due proc-

ess requirement of the Fifth Amendment." *Johnson v. Robison,* 415 U.S. 361, 364 n.4, 94 S.Ct. 1160, 1164 n.4, 39 L.Ed.2d 389, 396 n.4 (1974).

the policy of the United States that all citizens shall have the opportunity to be considered for service on grand and petit juries in the district courts of the United States, and shall have an obligation to serve as jurors when summoned for that purpose. 28 U.S.C. § 1861. The Act's legislative history amplifies this policy:

The purpose of [the Act] is to provide improved judicial machinery for the selection of Federal grand and petit jurors. Its aim is to assure to all litigants that potential jurors will be selected at random from a representative cross section of the community and that all qualified citizens will have the opportunity to be considered for jury service.

S.Rep.No.891, 90th Cong., 2nd Sess. 9, reprinted in [1968] U.S.Code Cong. & Ad. News 1792, 1792.

In order to achieve the cross-sectionality objective, the Act embodies two important general principles:

(1) random selection of juror names from the voter lists of the district or division in which court is held; and (2) determination of juror disqualifications, excuses, exemptions, and exclusions on the basis of objective criteria only. These principles provide the best method for obtaining jury lists that represent a cross section of the relevant community and for establishing an effective bulwark against impermissible forms of discrimination and arbitrariness.

*Id.* at 1793. Random selection "virtually eliminates the possibility of impermissible discrimination and arbitrariness at all stages of the jury selection process, and thereby tends to insure that the jury list will be drawn from a cross section of the community," while the "objectivity principle" was intended to prohibit the then "widespread current practice of imposing qualifications above and beyond those specified by Congress." *Id.* at 1794 and 1795.

The Act expressly contemplates that in many respects each district court bears the responsibility of devising and placing into operation a written plan for random selection of grand and petit jurors to be drawn from a fair cross section of the community.

■ We therefore conclude that a violation of the district's Local Plan constitutes a violation of the Act if the Local Plan's provision not adhered to effectuates one of the two paramount purposes of the Act. *See United States v. Tarnowski,* 429 F.Supp. 783, 790 (E.D.Mich.1977), *aff'd,* 583 F.2d 903 (6 Cir. 1978), *cert. denied,* 440 U.S. 918, 99 S.Ct. 1238, 59 L.Ed.2d 468 (1979).

A remedy is not provided for every violation of the Act or Plan. Rather:

Congress recognizing that there would undoubtedly be error in the jury selection process that should not result in the dismissal of an indictment, left room for harmless error by providing that dismissal should lie only when there was a *substantial* failure to comply with the Act.

*United States v. Evans,* 526 F.2d 701, 705 (5 Cir.) (emphasis original), *cert. denied,* 429 U.S. 818, 97 S.Ct. 62, 50 L.Ed.2d 78 (1976). The Fifth Circuit has made clear that a determination of whether there has been substantial compliance with the Act "requires that the alleged violations of the Act be weighed against the goals of the statute." *United States v. Smith,* 588 F.2d 111, 115 n.22 (5 Cir. 1979); *United States v. Carter,* 568 F.2d 453, 455 (5 Cir. 1978); *United States v. Davis,* 546 F.2d 583, 589 (5 Cir.), *cert. denied,* 431 U.S. 906, 97 S.Ct. 1701, 52 L.Ed.2d 391 (1977). Thus, "[o]therwise technical violations of the statute constitute 'substantial failure to comply' when they affect the random nature or objectivity of the selection process." *United States v. Kennedy,* 548 F.2d 608, 612 (5 Cir.), *cert. denied,* 434 U.S. 865, 98 S.Ct. 199, 54 L.Ed.2d 140 (1977).

Once substantial noncompliance with the Act or Plan has been established, "the court [must] stay the proceedings pending the selection of a grand jury in conformity with this title or dismiss the indictments, whichever is appropriate." 28 U.S.C. § 1867(d). Furthermore, staying the proceedings or dismissing the indictments is "the exclusive means by which a person accused of a Fed-

eral crime . . . may challenge any jury on the ground that such jury was not selected in conformity with [the Act]." *Id.* § 1867(e).

With these principles in mind, we turn to the specific issues of the statutory and plan challenges raised by defendants in the administration of the jury selection process in the Northern District of Georgia.

Jury selection challenges in the Northern District of Georgia are not strangers to the Fifth Circuit. *United States v. Davis, supra; United States v. Kennedy, supra.* In both cases, the Fifth Circuit was critical of the District's failure to comply with 28 U.S.C. § 1861 et seq., as well as the Local Plan adopted pursuant to the Act. A detailed discussion of the historical implementation utilizing computers may be found in *Davis,* and is reiterated here only to the extent necessary to understand this opinion.

*Challenges Based on Randomness: Starting Numbers and Public Notice*

During orientation on the new automated jury selection system in 1975, the General Services Administration (GSA) instructed the clerk's office on how to work in conjunction with the system's computer. Pursuant to the Act and the Local Plan, the district's procedure utilizes voter registration lists from each county within the district. The GSA program automatically selects names from computer tapes furnished by Georgia counties that themselves utilize automated systems. For those counties that rely on printed or written lists, the clerk's office is responsible for "red-lining" or checking names to be placed in the master wheel. Names are selected to assure proportionate divisional representation in the master wheel. The GSA then creates a master wheel computer tape in which the entire array of names is alphabetized and each name given a number. The tape also retains divisional identity for each name. The GSA and the clerk's office properly performed these selections from voter registration lists to master wheel.

In mid-1976, work began on the construction of four new qualified wheels, one for each division in the district. The GSA computer was utilized to address standard Juror Qualification Questionnaires, on a form approved by the Administrative Office of the United States, to each of the 59,352 persons whose names were contained on the four master jury wheels. The questionnaires were in turn mailed, with instructions to the addressees that they be completed, signed, dated, and returned to the clerk's office. Approximately 42,000 questionnaires were returned to the clerk's office as directed. Upon receipt, the returned questionnaires were screened by the jury clerk, Angela Turner, and two or three assistants to determine whether, under the requirements of the Plan and the Act, they should be included or excluded from the respective qualified wheels. Turner and her assistants performed the qualifying task after being instructed by the clerk of court Ben H. Carter, as to the proper bases for excusal, exemption, and disqualification under the Plan and Act. Carter was thereafter consulted only when specific questions concerning a particular individual arose. Then-Chief Judge Henderson was seldom consulted during the screening process, which took approximately six months. Of the 42,105 returned questionnaires, 11,875 were either disqualified, excluded, exempted, or excused; the remaining 30,230 were qualified by the clerk's office. When a prospective juror was qualified, this fact was noted on a computer-punched card that was returned to GSA, which fed the information from card to computer for recording on the master wheel tape. Thus, the qualified wheel consists of prospective jurors marked "qualified" on the master wheel computer tape; there is no separate tape or computer printout made up of only qualified jurors.

When the court requires a panel of qualified jurors, whether grand or petit, it sends an order to the clerk's office. For grand juries the clerk draws a proportionate number of potential jurors from each division. A grand jury panel usually numbers 50, of which 33 are picked from the Atlanta qualified wheel, 8 from the Rome qualified wheel, 5 from Newnan and 4 from Gainesville.

However, before the panel may be chosen, an "increment" or "quotient" number must be calculated for each division. An increment equals the number of qualified jurors remaining in a division's qualified wheel divided by the number of jurors needed from that division. For example, if the Atlanta Division retains 18,000 qualified names, the increment would be 18,000 ÷ 33, or 545.[26] The jury clerk must then, at random, draw a "starting" number within the range of one to the increment number, inclusive. For each division the clerk fills out a "transmittal" form, which includes both starting and increment numbers, for delivery to the computer. Because the Northern District of Georgia contains four divisions, the jury clerk must forward four transmittal sheets for each grand jury panel.

The GSA picks, as the first name from each divisional wheel, the prospective juror whose position in the qualified wheel corresponds to the starting number picked by the clerk's office. Thereafter the computer selects each qualified juror whose position falls one increment number farther down the list from the previous qualified prospective juror selected. For example, choosing from the Atlanta Division, with an increment number of 545 and a starting number of 123, the persons in the qualified wheel at positions 123, 668, 1213, and so on until the thirty-third person was chosen would constitute the portion of the grand jury panel drawn from the Atlanta Division's qualified wheel.

Each person whose name is selected from the computer is mailed a summons for service. Juror information cards are completed by the summoned individual, who is instructed to inform promptly the court if he or she has a reason for being unable to serve. Many people are excused by the jury clerk prior to reporting. When such an excuse is granted, the computer center is notified so that it may enter the information on the computer tape.[27] Persons permanently excused are removed from the qualified wheel. Those whose service is deferred are supposed to remain in the qualified wheel, along with information concerning when they may subsequently serve. For later juror orders, the selection process is designed to go first through deferred names and pick those who may then serve.

Before choosing the starting number, the clerk's office is required to post public notice of the event. Afterwards, notice of the starting number selected is to be posted. Since 1971, Angela Turner, the jury clerk who continues to serve under Ben H. Carter, the current clerk of court, has been in charge of this procedure as well as the qualification process. Turner rarely complied with the first notice requirement.[28] In fact, for almost every drawing at issue, both notices were posted simultaneously, *after* the starting number had been drawn. On one or two occasions, when pressed for time, the clerk's office posted no notice at all. On the infrequent occasions when notices were posted before drawing the starting number, the number was selected no more than a few hours later. Sometimes selection of the starting number took place right away—as soon as the jury clerk could return to the clerk's office to perform the drawing. A few times Turner posted notices in her office behind her desk. She continued these practices despite contrary instructions by Carter, after previous challenges to the district's jury selection procedures.

Even now, public notice is given for no more than a brief period of time prior to starting number selection. Notices are posted as soon as Turner receives an order for a jury from a judge, but she draws the

---

**26.** Fractional numbers are dropped to the next lowest whole number.

**27.** The uncontradicted testimony is that unused petit jurors were usually "set over" to another petit jury, but unused grand jurors were seldom set over to other panels.

**28.** Both Turner and her assistant, Allen Newman, testified that they failed to see the importance of posting the first notice because no one ever appeared to witness the drawing. Given that adequate notice of the event was rarely posted, this fact is not surprising.

starting number in her office the same day. The interval between posting and drawing varies but usually extends only from one to two hours. The jury clerk posts notices on the twenty-second floor of the federal building on a bulletin board located to one side of the elevators, away from the public desk of the clerk's office.[29] In sum, we find as a fact that notice of starting number drawings has been, and remains, insufficient to give the public adequate notice. Violation of this requirement occurred practically without exception prior to the filing of these motions and continues to this day by the unreasonably brief time between the notice and the drawing of the starting number.

Although the Local Plan mandates use of "a drum or box containing numbered cards covering the same range of numbers as the 'quotient'" to draw the starting number, see Local Plan at 90a, Turner and her assistants rarely followed it. In 1975, when the district commenced using the computerized jury selection system, Turner picked starting numbers by holding the beginning pages of a dictionary from page one to the increment number, then flipping the book open for a "random" number. She testified that she tried to vary from left to right within the pages held but admitted that she had a tendency to keep away from the end pages.

In 1976, Carter gave Turner a wheel and told her to use it instead of the "book" method. Nevertheless, Turner rarely resorted to the wheel because it did not contain the proper number of cards, i. e., from one to the increment number, whatever it might be at a particular drawing. Instead, being pressed for time, she began to use her own method to obtain starting numbers. The so-called "Turner" method entailed picking a number out of her head which, she testified, was always within the increment number. Although Turner denied that she had any favorite number, she did favor her own method over the "book," wheel, or any other method.

Turner sometimes asked her assistant, Allen Newman, for a starting number rather than select one herself. Newman was responsible for 15 to 20 of the starting number selections. He testified that Turner would ask him for a number between one and 100, irrespective of what might be the range of the increment number. However, at least after 1978, when the jury selection procedures of the district were previously challenged, Newman used the wheel when the increment number was less than the number of cards the wheel contained. At other times the assistant used his own variation of the "book" method by placing the dictionary on its back and letting it fall open. When necessary, he would continue this procedure until he obtained a number within the increment range.

Newman also testified, and Carter confirmed, that Carter directed Turner to use the wheel exclusively. Nonetheless, the jury clerk failed to change the number of cards in the wheel to match the increment range for each individual selection. Instead, Turner continued to do most of the selections according to her own methods. It took another warning by Carter, precipitated by the filing of the present motions, for Turner to commence using the wheel without exception and to select from the wheel starting numbers by use of discs, numbered from one to the increment number.

According to undisputed evidence, the jury clerk picked 92 starting numbers for grand and petit jury selections from the Atlanta Division qualified wheel during the period March 3, 1977, through April 9, 1980. Of these 92, six numbers accounted for 29 choices, or 32% of the 92. These numbers and their frequencies were: 69—5; 76—5; 77—3; 78—6; 88—4; 89—6. Another statistic reveals that the numbers 50 through 90, inclusive, accounted for 39 of the 92 choices, or 42%. Also, although increments

---

**29.** The Richard B. Russell Building has 23 floors, of which the court and its personnel occupy the top half-dozen floors. There is no evidence why the notices were not posted on a bulletin board located on the building's ground floor lobby or other conspicuous place frequented by the general public.

ranged as high as 557, the highest starting number ever picked was 288, and the second highest was 201. On the basis of these numbers alone, Dr. Wang, the government's expert applied mathematician, stated that he could not conclude whether or not these starting numbers had been randomly chosen. However, he did say that no one can pick a "random" number out of his head.

From March 8, 1978, to January 3, 1980, the jury clerk chose 59 total starting numbers for Atlanta Division petit juries and the Atlanta Division's portion of grand juries.[30] Calculated as percentages of the highest possible increment number during this period (557), the proof shows that only one starting number (1.7% of the 59 starting numbers) fell within the highest quartile (25%) of the increment range. The 10 grand jury starting numbers chosen for the Atlanta Division over this period were within the range of 8% to 40% of the highest possible increment number. Dr. Wang admitted that these starting numbers were relatively low considering the range of the possible increment numbers. He concluded, and we find as a fact, that the data showed starting numbers for these 10 grand jury selections were not randomly chosen. Since Turner was responsible for selecting starting numbers in the Gainesville, Newnan, and Rome Divisions, she caused most, if not all, of such selections of starting numbers to be similarly made in a nonrandom manner.

Dr. Wang was of the firm opinion that despite these nonrandom starting numbers, over the passage of time the likelihood that a particular juror would be chosen was approximately equal to that of any other person in the qualified wheel.[31] He characterized Turner's methods as nonrandom processes that nevertheless culminated in random results since Dr. Wang's analysis showed that "over a period of time," the actual starting number selected becomes irrelevant to the probability of any particular prospective juror being picked. He based his conclusion on the observation that increments are different for each selection because the qualified wheel constantly dwindles; because petit and grand juries requiring different panel sizes are drawn from the same list and therefore alter the relative order of jurors remaining in the wheel; and because the "set over" of unused petit jurors to another petit jury contributes to differing increment numbers. He therefore was of the opinion that the increment number and not the starting number is the key to randomness. This expert concluded that in view of these variables, the starting number over a period of time has little, if any, effect on the chance of any person in the qualified wheel being chosen as a venireman.[32]

The importance of random selection of starting numbers stems from the fact that given a list of persons in the qualified wheel and records of selections to date, it would

---

**30.** These starting numbers were selected for the grand juries empaneled from April 13, 1978 to February 5, 1980.

**31.** Dr. Wang stated that this would not hold true for the "remainder" group, i. e., those persons at the very end of the wheel. The remainder group has less chance of being chosen since fractional increment numbers are rounded to the next lowest whole number.

We view this deviation from statistical randomness as minimal. *See* note 36 *infra*. However, we do not agree with the government that *United States v. Blair*, 493 F.Supp. 398 (D.Md. 1980), so interpreted the Act under its randomness provisions. In *Blair*, the increment number used for selection from the qualified wheel was generally too small. Therefore, each jury panel contained too many names. The clerk eliminated excess names by dropping from the bottom of each panel persons whose names

began with X, Y and Z. Although *Blair* discussed randomness, the court held, following *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), and *United States v. Test*, 550 F.2d 577 (10 Cir. 1976) (en banc), that persons having surnames beginning with X, Y and Z do not constitute a "distinct group" in the community. 493 F.Supp. at 410. Thus, *Blair's* analysis is based upon the independent requirement of a fair cross-section of the community, or cross-sectionality, and not upon the Act's requirement of randomness.

**32.** Defendants attempt to contradict Dr. Wang's assertion that starting numbers are irrelevant to randomness over the passage of time through statistical tests performed by their counsel and submitted to the court in their brief. We do not consider these materials since they do not constitute evidence.

be possible for the jury clerk to include one or perhaps more than one qualified individual in a particular grand or petit jury. The possibility of such an act may be no more than theoretical. Although the necessary records, in the form of computer punched cards, are maintained in the clerk's office, their sheer numbers would render this task extremely difficult and time-consuming. In any case, there is neither evidence nor even an allegation that Turner or anyone else attempted to manipulate the system with this purpose in mind. Nevertheless, one cannot rule out the possibility for abuse in defeating random jury selection.

Since we find as a fact that the jury clerk's starting number choices were not random, the selection process did not result in random panel choices for individual grand juries. For grand juries viewed one at a time, the chances for qualified wheel members to be picked were certainly not substantially equal. Although, as Dr. Wang testified, the starting number becomes immaterial after the passage of an indeterminate period of time, there is no way of knowing what duration of time is required to produce this inadvertent result of randomness. Moreover, the evidence does not show simply a single departure from the plan's requirement for selecting a starting number. On the contrary, nonrandom methods of selecting starting numbers were regularly employed in drawing grand and petit jurors many times over a period of several years.

Defendants contend that their indictments should be dismissed because the clerk's office has transgressed the requirements of random selection of starting numbers, as well as public notice of starting number drawings. That the Act and the Plan were violated by the use of nonrandom methods to select starting numbers and by the failure to post adequate notice is indisputable. The question we must determine is whether these deviations constitute substantial failure to comply with the Act and Plan. These violations, defendants urge, per se constitute substantial failure to comply with Act and Plan, warranting dismissal of the indictments. The government responds that "substantiality" must be measured by its effects on randomness. The government reasons that "over the passage of time," starting number selection results in randomly chosen grand jury panels because both petit and grand jurors are constantly drawn from the qualified wheel and are not replaced, thus altering their relative positions within the qualified wheel (the "nonreplacement factor," as termed by Dr. Wang). The government maintains no material consequences have flowed from nonrandom selection of starting numbers, making this violation of the Act and Plan merely technical. In addition, the prosecution urges such lack of notice did not affect ultimate randomness and that this deviation from the Act and Plan should also be regarded as minimal and insubstantial.

The Fifth Circuit has expounded on the issue of randomness in *United States v. Kennedy, supra,* and *United States v. Smith, supra.* In *Kennedy,* a case from the Northern District of Georgia, the jury clerk faced a shortage of prospective jurors during the July term of court. Instead of supplementing the number of July prospects available in the qualified jury wheel, the jury clerk solicited volunteers from jurors who had served during the June term. Three volunteers remained on Kennedy's panel when Kennedy's counsel, just prior to voir dire, orally objected on the basis of the "random selection rule." 548 F.2d at 610.

On appeal, the Fifth Circuit found that this method violated the Act in two respects. First, a list of the prior term's jurors did not constitute an alternative source list within the meaning of 28 U.S.C. § 1866(f),[33] which delineates options for summoning petit jurors when the court

---

**33.** 28 U.S.C. § 1866(f) states:

When there is an unanticipated shortage of available petit jurors drawn from the qualified jury wheel, the court may require the marshal to summon a sufficient number of petit jurors selected at random from the voter registration lists, lists of actual voters, or other lists specified in the plan, in a manner ordered by the court consistent with sections 1861 and 1862 of this title.

faces an unanticipated shortage of them. More important, assuming § 1866(f) permitted use of the June term's jurors from which to make emergency selections, the jury clerk, by asking for volunteers, did not select panel members from that list at random, required by § 1866(f). As the court said, "[i]t seems self-evident that allowing people to decide whether they wish to perform a particular task is quite the opposite of randomly selecting those who, unless within narrow and objectively determined categories of exemptions and excuses, must perform the task. A volunteer is not a random selectee." 548 F.2d at 611 (citation omitted).

The Fifth Circuit concluded that this failure to comply with the Act was substantial, the court reasoning that

> [o]therwise technical violations of the statute constitute "substantial failure to comply" when they affect the random nature or objectivity of the selection process.

> . . . . .

> We need not speculate as to what sort of biases will be reflected in a jury chosen on the basis of its members' willingness to depart from their daily business and serve as jurors. *It is enough to recognize that a substantial variable, not contemplated by the Act's few, narrow categories of qualifications, exemptions, and excuses, has confounded the selection process.*

> . . . . .

> *A litigant need not show prejudice to establish a "substantial failure to comply" with the Act.* Congress deleted just such a requirement from the bill presented to the conference committee. . . . Moreover, when a statutory violation directly affects the random nature of the selection process, there is no need to show that the violation tended to exclude some cognizable group from that process. Congress did not simply outlaw certain disparities in representation of certain

groups on juries; it designed a procedure of random selection to ensure that no such disparities would arise. A departure from the statutory scheme that directly affects the random nature of selection establishes a substantial violation independently of the departure's consequences in a particular case. (Emphasis added).

*Id.* at 612 (citations omitted) (emphasis added). The conviction was nevertheless upheld because of the failure of defense counsel to properly raise the issue.[34]

Though *Kennedy's* pronouncements on violations of the Act vis-a-vis substantiality are obiter dicta, they remain the most extensive Fifth Circuit discourse on the subject and are given added weight by the fact that they were cited with approval in *United States v. Smith, supra. Smith* considered whether supplementing a qualified wheel by returning to it "names of persons who had served more than two years previously and those who had been called but for some reason did not serve" amounted to a substantial violation of the Act. *Id.* at 113. It was contended that the clerk's office contravened § 1866(f),[35] because a method not listed in that section was employed to obtain emergency jurors.

After first construing § 1866(f) as merely directory, the Fifth Circuit inquired whether other subsections of § 1866 prohibited the challenged practice:

> In examining other subsections of § 1866, we find that (c), which states that persons excluded on certain grounds may sit on other juries, contemplates that many persons who have been called but have not served may be called again. Moreover, subsection (e), which prohibits requiring any person to serve more than 30 days within any two year period, recognizes that some jurors may serve more than once in four years. The fact that a person is called a little over two years after prior jury service does not, in and of itself, violate the statute. And since the

---

34. See timeliness requirements under the Act, *supra*, pp. 671–681.

35. See note 33, *supra*.

inherent random nature of the selection process is not significantly affected by such an occurrence, we find that the actions appellants complain of did not frustrate the purpose of the Act.

*Id.* at 114–15 (citations omitted). In a footnote to the quoted paragraph, the court stated that this practice did not significantly affect the inherent random nature of the selection process because "[t]he panels are still selected at random from a large group of names. The procedure used here would never produce a jury like that the Court condemned in *United States v. Kennedy.*" *Id.* at 115 n.21. The court thus concluded that the clerk's actions were not prohibited by statute and that in any case, the slightly greater likelihood and opportunity of some persons in the qualified wheel to be selected more than once did not constitute substantial noncompliance.

 Although neither *Smith* nor *Kennedy* is factually in point, they do stand for the proposition that violations of the Act or Plan in drawing starting numbers, to be actionable, need not necessarily manifest themselves in some resulting harm, and that transgressions must be evaluated in the light of the purposes of the Act. To determine whether these nonrandom procedures constitute a "substantial failure to comply," we must decide how important they are toward accomplishing the goals of the Act. When deviations from the Act are important, they can only be characterized as "substantial." The Plan itself emphasizes the importance of the random selection of the starting number as follows:

> The '*starting number*' is a number drawn by lot from a drum or box containing consecutively numbered cards covering the same range of numbers as the 'quotient.' ...
>
> Randomly drawing a 'starting number' by lot accomplishes three objectives:
>
> —it establishes the location on the voter name list(s), or wheel, from which the first name is taken;

—it *removes the possibility of human discretion or choice in selection of any individual's name* (making individual name selections unpredictable and unpredeterminable), and

—it insures that, at the outset of the drawing, *mathematical odds of being picked are substantially equal* for all names in the source from which drawn.

Local Rules, at 90a (emphasis added).

Under the facts of this case, it is appropriate to examine not only the methods used for selecting starting numbers, but the manner of providing public notice as well. Under 28 U.S.C. § 1866(a), "the clerk shall publicly draw at random from the qualified jury wheel such number of names of persons as may be required for assignment to grand and petit jury panels." "Publicly draw" is defined by § 1869(k) to mean "a drawing which is conducted within the district after reasonable public notice and which is open to the public at large." Under the district's plan, "[r]andom drawings of starting numbers shall be publicly made ... at times to be publicly announced on the Court bulletin board." Local Plan at 90b.

Few cases deal with the discrete issue of public notice at any stage of the jury selection process.[36] An approach to the problem of public notice arose in *United States v. Dalton*, 465 F.2d 32 (5 Cir.), *cert. denied*, 409 U.S. 1062, 93 S.Ct. 570, 34 L.Ed.2d 515 (1972). In *Dalton*, the defendant challenged selection of the grand jury that indicted him on the ground that the drawing was not in a public place but in a room in the clerk's office attended only by clerk personnel, yet open to the public. The Fifth Circuit stated briefly: "There is no merit in [defendant's] contention.... This was not an invalid procedure." 465 F.2d at 34. The case was cited with approval in *Davis.*[37]

---

**36.** Although *United States v. Huber*, 457 F.Supp. 1221 (S.D.N.Y.1978), peripherally addresses the problem, the particular facts of *Huber* render it wholly inapplicable.

**37.** In *United States v. Dalton* ..., we held, *inter alia*, that a grand jury selection in which the drawing took place in a room in the clerk's office where only clerk personnel were present withstood a challenge based on non-public

As in the case sub judice, *Davis* originated in the Northern District of Georgia. The primary question in *Davis* was whether lack of public access to jury selections from qualified wheel made by computer amounted to substantial violation of the Plan. The computer, operated by the GSA in Atlanta, was as a rule closed to contact from the public because of the necessity for physical security, the special atmospheric conditions necessary to computer functioning, and space limitations. *Id.* at 588. Noting that, by the time the case reached the court of appeals, public access to drawings was being freely granted and would continue, the Fifth Circuit ruled that "the lack of public access to the automated drawings did not amount to 'substantial failure to comply' with the Act." *Id.* at 589. The court stated that lack of public access to drawings of names from the computer amounted to a mere technical violation and did not affect the "random nature and objectivity of the selection process." *Id.* Of special significance to the instant cases is the following observation of the court:

> If we were left in the dark about the procedures employed behind closed doors, or if we had reason to believe that there were any improprieties which had escaped detection as a result of non-public drawings, the result might be different. In such a case, of course, the concern would be not with the procedures themselves but rather with their effect on the random nature and objectivity of the selection.

drawing of the jurors' names. The court was influenced by the fact that the room was open to the public.... [T]he case illustrates that a complaint of lack of public access in the jury selection process is not the sort of deviation from the statutory scheme that this court is prone to view as substantial noncompliance with the Act.
546 F.2d 589 n.19.

**38.** In the interest of theoretical accuracy, some qualifications should be added. Although the bill declares as its policy that litigants in the Federal courts "have the right to grand and petit juries selected at random," the selection system under the bill would not be entirely random. At various points in the process, candidates for jury service may be eliminated if

*Id.* Thus, according to the rationale of the Fifth Circuit in both *Dalton* and *Davis*, lack of public access to the grand jury selection process constitutes a substantial violation of the Act if it masks deviations from its requirements.

Both *Dalton* and *Davis* involved challenges based on inaccessibility of the public to the jury selection process, while here we are concerned not with the place of the drawing or the accessibility of the public to that place but, rather, with the adequacy of the notice of the drawing given. A public drawing is, of course, meaningless unless the public is notified reasonably in advance of the time and place of the drawing. This much is recognized by the Act's definition of "publicly draw" under § 1869(k). We conclude that if notices of starting-number drawings are not reasonably adequate for the public to make use of the information contained in them, and in fact starting-number drawings did not comply with the requirements of Act and Plan such that they affected "the random nature and objectivity of the selection," then a substantial violation of Act and Plan has occurred.

We do not think that infrequent, simple, inadvertent deviations in random selection of starting numbers and adequacy of public notice should constitute a substantial failure to comply with the Act or the Plan and result in harsh consequences of dismissal of indictments. That a standard of perfection in achieving randomness was not contemplated by Congress is clear from the legislative history.[38] Nevertheless, deviations

they fall short of the requirements for service specifically enumerated in the bill. Moreover, peremptory challenges and challenges for cause are retained. All of these instances are, strictly speaking, exceptions to a purely random selection system. But the bill otherwise firmly establishes the principle of randomness by requiring the use of random techniques for arriving at the names of those who shall then be subject to the specified bases for elimination.

It is also true that, to the extent that the bill does provide for random selection, it does not insist upon randomness in the sense in which that term might be understood by statisticians. Many districts may seek the aid of statisticians in developing systems of selection that do meet

which cease to be inadvertent or infrequent and become the rule by which the jury selection process is administered offend the expressed goals of the Act and the carefully devised district plan to the extent that we are compelled to provide a remedy which will assure the cessation of such offensive practices. Indeed, it must be pointed out that the Northern District of Georgia has twice had clear warning that its jury selection practices were likely in substantial violation of the Act and Plan.

*Davis* practically compels this conclusion. *Davis* was decided in part on the assumption that the clerk's office had commenced to post proper notices of drawings and would continue to do so, the court stating:

> Public announcement of both the drawing of the starting number in the clerk's office and the automated drawing of the names at the computer center is required by the local plan. *Notices to that effect are now posted in advance of the drawings.*

546 F.2d at 588 n.17 (emphasis added).

Unlike the Fifth Circuit in *Davis*, we are not "left in the dark about the procedures employed behind closed doors," and we know that "improprieties" [39] took place in the form of nonrandom drawings. *Id. Davis'* warning to the clerk's office went unheeded for, as we have found, inadequate notice continues even at this date. We resist the temptation merely to warn the clerk's office, as the *Davis* court did without resulting change.

Moreover, the clerk's office was cautioned a second time by the Fifth Circuit in *Ken-* *nedy*, decided only some two months after *Davis.* The Court of Appeals condemned the practice of soliciting "volunteer" jurors, concluding that this substantially violated the Act. Although the court ruled against the defendant, it warned the clerk's office that "had appellant properly preserved his objection to the practice, *he would clearly have been entitled to relief.*" 548 F.2d at 612 (emphasis added). The clerk's office should have comprehended that it must follow the Plan by picking starting numbers by lot from a box or drum. Yet the jury clerk continued her nonrandom drawings despite warnings from the clerk of court to cease.

We are at a loss to understand why after two rebukes from the Fifth Circuit the clerk's office has continued to fail to comply with the express requirements of Act and Plan. That it has continued to do so highlights the need for adequate public notice to insure starting numbers were randomly selected in accordance with the Act and the Plan, and the public and litigants must have an opportunity to observe this process to insure that these abuses which have been the subject of judicial comment are no longer continued. We therefore find substantial violations of the Act and Plan have occurred by the regular utilization over an extended period of time of nonrandom selections of starting numbers, together with the persistent failure over a significant period of time to post the required notices.

the standards of that profession, and they are encouraged to do so. No doubt such systems enhance the likelihood of attaining the cross sectional goal of the bill. But for reasons of administrative feasibility your committee did not deem it necessary to require the use of random selection in the statistical sense. It is sufficient for the purpose of this legislation if the plan adopts some system of selection that affords no room for impermissible discrimination against individuals or groups.

Thus, for example, the plan may specify selection of every 70th name from the voter list, or every name at the bottom of a page in the list, or all the names on the list, even though in certain cases statisticians might not agree that truly random selection would be the result. Likewise, in drawing names from the mastet (sic) and qualified jury wheels some similar processes may be designated. Under this definition of randomness, the plan may also permit courts to continue to use "rotation methods" or "jury pools" in assigning persons to grand and petit juries, provided that these methods, too, are free from any taint of impermissible discrimination against groups or individuals. ... S.Rep.No.891, 90th Cong., 1st Sess. 16 n.9 (1967).

**39.** We construe "improprieties" to mean misfeasance, as in this matter, rather than necessarily meaning malfeasance.

*Challenges Based on Objectivity: Exclusion Based on Disqualifications, Exemptions, and Excusals.*[40]

Of the 11,875 juror questionnaires which the jury clerks determined to be disqualified, exempt, or excused, and therefore excluded from the qualified jury wheels, defendants challenge that 1537 were erroneously excluded under the Act or Plan. To address the substantiality of this claim, the court has had to assume the tedious task of reviewing all of the questionnaires in issue. As previously stated, it is undisputed that the review of returned questionnaires for determination of excusals, exemptions, and disqualifications was performed largely by Turner, the jury clerk, and two or three assistants. The clerk of court apparently felt that he had gained familiarity with the requirements of the Plan in filling the 1973 master and qualified wheels by working closely with then-Chief Judge Sidney Smith concerning screening of the juror questionnaires. During the 1977 qualification process and as new qualified wheels were constructed, however, Carter, under then-Chief Judge Henderson, seldom, if ever, sought screening advice and contemporaneous approval of the Chief Judge or any other district judge. During this period, Carter was only occasionally consulted by jury clerks when they were unsure of whether a particular person should be excused, exempted, or disqualified.

Our analysis of the challenged questionnaires reveals exclusions from the qualified wheel which deviate from the Plan and Act in the following particulars:

1. *Erroneous "Age" Excusals.* The Plan provides that "all persons over 70 years of age at time of executing the jury qualification form" may be excused upon individual

---

**40.** The terms "disqualified," "exempt," and "excused" are terms of art with distinctive meanings. Under 28 U.S.C. § 1865(b), every person in the master wheel is qualified for jury service unless he

(1) is not a citizen of the United States eighteen years old who has resided for a period of one year within the judicial district;

(2) is unable to read, write, and understand the English language with a degree of proficiency sufficient to fill out satisfactorily the juror qualification form;

(3) is unable to speak the English language;

(4) is incapable, by reason of mental or physical infirmity, to render satisfactory jury service; or

(5) has a charge pending against him for the commission of, or has been convicted in a State or Federal court of record of, a crime punishable by imprisonment for more than one year and his civil rights have not been restored.

Like disqualified persons, those who are exempt are barred from jury service. 28 U.S.C. § 1863(b)(6). This category must include the following persons:

(i) members in active service in the Armed Forces of the United States;

(ii) members of the fire or police departments of any State, district, territory, possession, or subdivision thereof;

(iii) public officers in the executive, legislative, or judicial branches of the Government of the United States, or any State, district, territory, or possession or subdivision thereof, who are actively engaged in the performance of official duties.

Although the Local Plan, under § 1863(b)(6), may provide for exemption of such other groups of persons as the district court finds would be in the public interest and consistent with the Act's purposes, the Northern District of Georgia has elected to exempt only the classes of persons required by the Act.

Persons excused from jury service are, on individual request, relieved of their obligation to serve on juries. The Act empowers the district to specify, in its Local Plan, groups of persons or occupational classes whose members shall be excused because jury service would entail undue hardship or extreme inconvenience to them, provided excusal would not be inconsistent with the purposes of the Act. The Act does not identify any such groups, but the district's Local Plan lists the following as those who should be excused from jury service:

(1) all ministers of the gospel and members of religious orders actively so engaged;

(2) all actively practicing attorneys, physicians, dentists, and registered nurses;

(3) any person who has served as a grand or petit juror in a federal court during the past two years immediately preceding his call to serve;

(4) persons having active care and custody of a child or children under 10 years of age whose health and/or safety would be jeopardized by their absence for jury service;

(5) a person who is essential to the care of aged or infirm persons; and

(6) all persons over 70 years of age at time of executing the jury qualification form.

Local Plan at 88.

request. Local Plan at 88. Defendants maintain that "over 70 years of age" means at least "71." We disagree with this construction. In our minds, "over 70" means "70 + one second." Therefore, we find that excusals of persons 70 years or over, when requested, were properly granted. Nonetheless, the clerk's office incorrectly excused at least 188 individuals on the basis of this category. Forty-three persons were excused before they had reached the age of 70 "at time of executing the jury qualification form." More serious, however, is the fact that 135 prospective jurors 70 or over were excluded from the qualified wheel even though they did not request excusal.[41] The government attempted to downplay the significance of these figures by introducing questionnaires of persons age 70 or over who were included in the qualified wheels.[42] However, the court is concerned here only with violations of either the Plan or the Act, and not with whether all persons over age 70 were excluded from service. The fact that more persons were excluded on account of age than were included in the qualified wheels [43] is important at this juncture because it indicates that these errone-ous excusals were the result of a misunderstanding by the clerk personnel that persons over 70 were to be excused regardless of request and not the result of pure administrative mistakes. They were nonetheless purposely, and not inadvertently, excluded from the qualified wheel. That this practice was intentional is obvious from the fact that the jury clerks circled in red the ages of persons 70 or more.

2. *Erroneous Disqualifications Based on Intradistrict Moves.* Both the Act and the Plan provide that a person is qualified for jury service only if, inter alia, he "has resided for a period of one year within the judicial district." Plan at 89; 28 U.S.C. § 1865(b)(1). Although neither the Plan nor the Act disqualify individuals from service if they have not lived within a certain *division* of the court for one year, the clerk's office excluded at least 159 individuals because of interdivisional moves (both within and outside of one year prior to completion of the questionnaire) when these persons had resided within the district for one year prior to executing the questionnaire.[44] The

---

**41.** In some instances, a person age 70 or over did not specifically mark the age excuse but otherwise indicated on the questionnaire that he wished to be excused (e. g., by indicating physical or mental infirmity). We deem these affirmative indications, tantamount to a request for excusal, sufficient reason for exclusion despite the fact that the block requesting excusal on account of age was not checked.

**42.** Government's Exh. 91 was introduced to show that 132 persons over age 70 were included in the qualified wheel for the Atlanta Division. An examination of these questionnaires reveals, however, that two of these individuals (see Govt. Exh. 92–10 and 92–54) were not age 70 or over at the time of executing the questionnaire. Furthermore 18 of these persons (Govt. Exh. 92–6; –34; –42; –43; –45; ·62; –69; –72; –74; –90; –94; –95; –104; –117; ·122; ··126; –129; –130) had reached the age of 70 and demanded to be excused. These 18 individuals were therefore wrongfully *included* in the qualified wheel, which, although less objectionable than wrongful *exclusions*, see *United States v. Evans*, 526 F.2d 701, 706 (5 Cir.), *cert. denied*, 429 U.S. 818, 97 S.Ct. 62, 50 L.Ed.2d 78 (1976), should not be counted to sustain the government's claim. Hence, no more than 112 persons over age 70 were prop-erly included in the qualified wheel for the Atlanta Division.

Government's Exh. 93 shows that 16 persons over age 70 were included in the qualified wheel for the Gainesvill Division. Since two of these individuals had requested to be excused (Gov. Exh. 93·5 and 93·12), only 14 persons over age 70 were properly included.

Government's Exh. 94 shows that 31 persons over age 70 were included in the qualified wheel for the Rome Division. Since four of these individuals had requested to be excused (Gov. Exh. 94–2; ··7; ·9; ·19) only 27 persons over age 70 were properly included.

Government's Exh. 95 shows that only 6 persons over age 70 were included in the qualified wheel for the Newnan Division.

Thus, while 159 persons were properly included in the qualified wheels for the Northern District of Georgia, 43 persons under age 70 were improperly excluded on the basis of age and 135 persons over age 70 were improperly excused, for a total of 188 wrongful exclusions based on age.

**43.** See note 42 *supra.*

**44.** In addition, at least 25 persons were excluded from the qualified wheel only because of intradivisional moves. It is undisputed that these exclusions were wrongful.

clerks understood this procedure to be mandated by the Plan since it provides that "names of grand and petit jurors serving on or after the effective date of this plan shall be selected at random from voter registration lists of all the counties *in the relevant division.*" Local Plan at 85 (emphasis added). The clerks thought that the underscored language required that an individual reside in the same division at the time of executing the questionnaire as that in which his name was drawn from the voter registration list. We disagree.

The Plan and Act provide for disqualification only if the prospective juror has not resided within the district for a period of one year. The voter registration lists provide the source for filling the master wheel; it is nowhere required that an individual be qualified to vote in the same division in which he resides, so long as his name was drawn from the voter registration list. We see no reason for disqualifying a person only because of an interdivisional but intradistrict change of residence. There is nothing in either the Act or the Plan to support the government's position in this respect. Any doubt must be resolved in favor of inclusion, not exclusion. Furthermore, the only reported decision on this topic fully supports our view that these exclusions were wrongful. In *United States v. Rosenthal*, 482 F.Supp. 867, 873 (M.D.Ga.1979), the court, faced with precise issue, summarily concluded:

> The one year residence requirement for jurors is not unconstitutional. *See e. g., United States v. Perry*, 480 F.2d 147 (5th Cir. 1973). Nor does the fact that the clerk may have disqualified someone who had resided within the district for one year but who had moved to another location within the district within one year, require dismissal of the indictment. The small number of persons within this category is too insubstantial to possibly amount to a violation of the statute or constitution.

Thus, while the court found that disqualifications based on intradistrict moves violates the Act, it held that the violation, based on number of persons affected, was not a substantial one.[45] We therefore conclude that the 184 persons disqualified on the basis of intradistrict changes in residence were improperly excluded from the qualified wheel.

3. *Erroneous Excusals and Exemptions Based Upon Occupation.* The Plan grants an optional excuse to "all ministers of the gospel and members of religious orders actively so engaged" and "all actively practicing attorneys, physicians, dentists, and registered nurses." Local Plan at 87–88. Furthermore, the following persons are exempt from service, and therefore automatically excluded from the qualified wheel regardless of request:

> (1) member in active service of the armed forces of the United States; (2) members of the Fire or Police Departments of any State, District, Territory, Possession or subdivision thereof; (3) public officers in the executive, legislative or judicial branches of the government of the United States or any State, District, Territory, or Possession or subdivision thereof who are actively engaged in the performance of official duties (public officer shall mean a person who is either elected to public office or who is directly appointed by a person elected to public office).

*Id.* at 88. Our review of the challenged questionnaires indicates that at least 72 persons were wrongfully excluded from the qualified wheel by reason of their occupation. The majority of these persons are registered nurses who did not request an excuse on that basis. The fact that these exclusions were intentional and not merely inadvertent is evidenced by the fact that in many instances the jury clerk underlined in red, for example, "registered nurse" on the questionnaire even though the prospective juror did not request an excuse on that basis.

4. *Erroneous Excusals on the Basis of Having Previously Served on a Grand or*

**45.** It is unfortunate that the opinion does not indicate how many persons were erroneously excluded on account of intradistrict changes in residence.

*Petit Jury.* The Plan grants an optional excuse to "any person who has served as a grand or petit juror in a federal court during the past two years *immediately preceding his call to serve." Id.* at 88 (emphasis added). The clerk's office excused at least 61 persons on this ground although these individuals indicated that they had served on such a jury within two years *of the date of completing the questionnaire* or had served only on a state or county jury. Since the Plan grants an excuse to the individual only if he served two years "immediately preceding his call to serve," these individuals should have been placed in the qualified wheel. Since the life of the qualified wheel is four years, the excuse of prior federal jury service would have expired for many persons at the time they would have been called to serve. Also, excusing persons who had served only on a state jury is contrary to the Plan. Furthermore, it is apparent that these exclusions were deliberate, and not merely inadvertent. Had the clear provisions of the Plan been followed, these errors would not have been made.[46]

5. *Other Exclusions Alleged to be Erroneous.* Defendants also maintain that numerous other prospective jurors were excluded improperly from the qualified wheel by the clerk's office, largely because of insufficient medical documentation indicating the person was incapable of rendering satisfactory jury service. Since the medical disqualification, unlike the other grounds for exclusion previously discussed, allows some room for discretion on the part of the excusing official, we hesitate to substitute our subjective judgment for that of the clerk's office in many of these instances and find it unnecessary to do so.[47]

 The government contends that since the percentage of challenged question-naires to mailed questionnaires is extremely small, defendants cannot establish substantial violations of the Act or Plan on grounds of objectivity. Our analysis of the applicable case law, however, compels us to conclude that a substantial statutory violation is presented when significant numbers of excusals, exemptions, and disqualifications have been wrongfully granted by jury personnel based on extra-statutory or -plan considerations, especially when these actions are taken without the contemporaneous approval of a district court judge.

Section 1865(a), which was adopted in the Plan, provides in part as follows:

> The chief judge of the district court, or such other district court judge as the plan may provide, on his initiative or upon recommendation of the clerk or jury commission, shall determine solely on the basis of information provided on the juror qualification form and other competent evidence whether a person is unqualified for, or exempt, or to be excused from jury service.

Thus, although a clerk may screen questionnaires and make recommendations to a district judge concerning exclusions from service, it is clear that § 1865 and the Plan contemplate active participation of a district court judge. It is no less clear that § 1865 requires that only competent evidence be used as a basis for disqualification, exception or excusal. The purpose of this requirement "is to prevent a disqualification from being made on the basis of subjective considerations, such as the unsupported opinion of the clerk or other such evidence that is not verifiable independently of personal feelings." [1968] U.S.Code Cong. & Ad.News 1792, at 1803.

Several cases have discussed the question of whether usurpation of judicial functions

---

**46.** Many of these problems would have been alleviated by more frequent drawings from the master wheel of names to be sent juror questionnaires rather than drawing all names and sending all questionnaires to prospective jurors at one time. 28 U.S.C. § 1864(a), however, leaves to the discretion of the district court the frequency of such drawings from the master wheel.

**47.** For appellate purposes, the court is dividing into categories those groups of questionnaires which we deem to be wrongfully excluded as well as those which we find to be properly excused, exempted, or disqualified. In addition, we are separating those challenged questionnaires that the court finds it unnecessary to rule upon.

by a jury clerk constitutes a substantial violation of the Act. In *United States v. Evans, supra,* the court was faced with the question of whether wrongful *inclusion* of names in the qualified wheel by jury clerks constitutes a basis for dismissal of defendants' indictments. The court emphasized the fact that the actions of the clerks resulted in improper inclusions of individuals rather than exclusions. 526 F.2d at 705–07. In finding no substantial violation occurred, the court noted that there was no showing that "in determining juror qualifications the clerks applied any non-objective criteria in violation of [the objectivity principle]." *Id.* at 706. Furthermore, the evidence did not establish that the clerks

> applied only extra-statutory, subjective criteria in the screening process. Rather, the clerks determined juror qualifications solely on the basis of the criteria specified in the Act and without a discriminatory result. While some technical errors were made, the fact that clerks, rather than a judge, made these determinations does not necessitate reversal.

The court emphasized that

> [t]he overwhelming majority of the errors alleged to have been committed by clerks in the screening process appear to have resulted not in the discriminatory exclusion from jury service against which the Act was intended to safeguard, but rather in the *inclusion* of persons who perhaps should have been relieved of jury duty. There may have been isolated examples of mistaken exclusion, but these alone do not afford a valid basis for challenging the grand jury.

*Id.* (emphasis in original) (footnote omitted). Since defendants in that case failed to show that anyone was excluded from service on the basis of extra-statutory, subjective criteria, there was no substantial violation of the Act. *Id.* at 706–07. Thus, in *Evans* there was apparently no evidence of widespread, consistent and deliberate exclusion of persons from the qualified wheel as there is in the case sub judice.

The determination of excusals, exemptions and disqualifications of potential jurors by jury clerks was again discussed in *United States v. Huber,* 457 F.Supp. 1221 (S.D.N.Y.1978). In that case, however, there was apparently no evidence that persons were being wrongfully excluded from the qualified wheel by the clerks.[48] *Huber,* therefore, stands only for the proposition that delegation of judicial functions to the jury clerk is not *per se* a substantial violation of the Act.

In *United States v. Jenison, supra,* the court found that the Act was violated since "prospective grand jurors were occasionally excused by jury section clerks without contemporaneous approval by a district court judge." *Id.* at 667. Notwithstanding violation, however, the court refused to dismiss the indictments because the excusals did not tend to frustrate the policies of the Act. In this regard, the court stated:

> The evidence does not establish that the Southern District clerks applied subjective criteria in excusing or disqualifying prospective jurors. As in *Evans,* "the clerks determined juror qualifications solely on the basis of the criteria specified

**48.** The entire discussion by the court on this issue was as follows:

> The defendant alleges that the district does not comply with its own Plan and with the Act because the Jury Clerk, and not the Chief Judge, determines who among those called for jury service is qualified for, exempt from, or excused from service, and that he likewise usurps the Chief Judge's function by granting postponements. *See* Plan Art. VI. With the exception of one discretionary exemption category, *i. e.,* "persons as to whom the Chief Judge finds for reasons other than the foregoing that jury service would constitute undue hardship or extreme inconvenience," Art. V, the other criteria consist of eight well defined, objective status exemptions mirrored in check-off boxes on the Juror Qualification Questionnaire. It would be an absurd waste of judicial manpower to require the Chief Judge to abstract this information from the questionnaires or to monitor the Jury Clerk as he does so, and the implied delegation of this ministerial task to the Jury Clerk in no way constitutes a "substantial failure" to comply with the Act. Insofar as the prospective juror claims "undue hardship or extreme inconvenience," such requests are "made to the Chief Judge or to the judge who impanels the jurors on the day they are summoned to report." Cornelius Affidavit ¶ 14.

457 F.Supp. at 1231.

in the Act and without a discriminatory result." *Id.* at 706. This court concludes that any improprieties in the selection process "did not operate to frustrate the goals of the Act." *Id.* at 706.

*Id.*

Finally, the Fifth Circuit has recently considered the question of whether delegation to jury clerks of judicial functions warrants dismissal of an indictment in *United States v. Maskeny*, 609 F.2d 183 (5 Cir.) (per Coleman, C. J.), *cert. denied*, 444 U.S. 921, 100 S.Ct. 3010, 65 L.Ed.2d 1112 (1980). While the court noted that *Evans* was not controlling since *Maskeny* involved exclusions of jurors rather than inclusions, it determined that dismissal of the indictments was not in order since defendants failed to show that "the clerk made *erroneous* determinations." *Id.* at 193 (emphasis in original).

These cases, in our opinion, stand for the proposition that a substantial statutory violation cannot be based solely on usurpation of judicial functions by jury personnel when there is no evidence that the clerk or his staff made erroneous determinations based on nonobjective, nonstatutory grounds. In the case sub judice, however, there is substantial evidence that the clerk's office made subjective, wrongful exclusions in a significant number of cases of prospective jurors based on nonstatutory grounds. These exclusions were granted because of the persistent failure to comprehend the specific objective criteria in filling the 1977 qualified wheels which both Congress and the district court deemed sufficient to warrant excusal, exemption, or disqualification. Of course, a certain number of clerical errors may be expected in any undertaking of the magnitude confronting the Northern District of Georgia. Nonetheless, this expectation may not justify or excuse the numerous and consistent wrongful exclusions which were the result of the application of nonstatutory and nonobjective grounds.[49] Since the erroneous excusals, exemptions, and disqualifications of potential jurors by the clerk's office resulted in frustration of the Act's policy of exclusion on the basis of specific objective criteria, we determine them to constitute substantial noncompliance.[50]

### *Erroneous Permanent Excuses by Jury Clerk After Summoning*

Defendants challenge the practice of the jury clerk in permanently excusing from jury service persons summoned for grand jury duty. Specifically, they allege that the clerk made erroneous exclusions in 74 instances from 1978 until February 1980.

Our examination of joint exhibits 156 through 165 reveal that 10 grand juries were empaneled during the relevant time period. Five hundred persons were summoned for service; 45 summonses were returned to the clerk's office unserved.[51] Of the 445 persons who were served, 141, or 32%, were excused prior to reporting by the clerk's office.

---

**49.** An example of utilization of nonobjective criteria as grounds for exclusion is apparent from the testimony of Allen Newman, Turner's assistant in the qualification process, that persons over age 70 were excused even if they did not request excusal if their handwriting was "shaky" or if they resided in a nursing or retirement home. Newman testified that these things indicated to him "mental infirmity."

**50.** *United States v. Matthews*, 350 F.Supp. 1103 (D.Del.1972) is not contrary to our holding. There, defendants challenged 49 excusals of persons from service. The court found that only 17 persons were wrongfully excluded and that 10 of these excuses were granted by the judge on the basis of undue hardship and extreme inconvenience and therefore denied defendants' motion to dismiss. Here, of course, we have far more than 17 wrongful exclusions,

none of which were granted by a district court judge who would more fully appreciate the consequences of his actions.

Neither is *United States v. Gurney*, 393 F.Supp. 688 (M.D.Fla.1974), contrary to our decision. In *Gurney*, the district court found that, with only one exception, exclusions were not based on nonstatutory or nonplan grounds. *Id.* at 705.

**51.** A comparison of the returned summonses with the individuals' questionnaires indicated that in 16 cases (representing 36% of returned questionnaires) summonses were sent to the same address as that to which the questionnaires were mailed, although the individuals indicated on the completed questionnaire that they had changed addresses. In all cases of returned summonses, the only indication of fol-

Regarding the 74 specific excusals challenged by defendants, five were actually excused by the court,[52] and one was absent from the proceedings without cause,[53] thus leaving 68. All but three of these individuals were permanently excused from the qualified wheel.[54]

Forty-one of the challenged excusals were based upon alleged "hardship" grounds. Fifteen of these individuals requested an excuse solely because of lack of transportation or fear of driving in downtown Atlanta,[55] while an additional 18 persons specifically requested only a temporary excuse.[56] Three others were excused because they were fulltime college students,[57] and an additional five persons requested excuses on miscellaneous "hardship" grounds.[58]

low-up is the fact that the jury clerk usually sent an "urgent notice" (see Govt. Exh. 114) to those persons who had not returned juror information cards. This notice, however, was sent to the same address as that to which the summons was sent. We point out these factors only as examples of poor administration easily corrected by the clerk's office.

**52.** Juror questionnaire numbers 314190; 376320, 041100; 190770; and 240150. Although defendants contend that these individuals were excused by the clerk's office, Govt. Exh. 46 indicates they were excused at empanelment by Judge Vining.

**53.** Juror questionnaire number 225570 in Joint Exh. 157. In examining Joint Exh. 156 through 165, we noted that 5 persons were absent from proceedings without cause. There is no indication in the record of any action being taken against these individuals. Apparently, they were merely excused and therefore taken out of the qualified wheel. 28 U.S.C. § 1866(g) requires that a person summoned for jury duty who fails to report

shall be ordered by the district court to appear forthwith and show cause for his failure to comply with the summons. Any person who fails to show good cause for noncompliance with a summons may be fined not more than $100 or imprisoned not more than three days, or both.

Persons should not, of course, be allowed to permanently escape jury duty because of failure to attend.

**54.** See juror questionnaire numbers 113120; 153580; and 116810, which were apparently set over to another term. These are the only 3 jurors of the 141 excused by the jury clerk after summoning who were not permanently excused.

**55.** See juror questionnaire numbers 188160; 414870; 203610; 375640; 534770; 455960; 114510; 531290; 004390; 091910; 471000; 479170; 015950; 203170; and 494010. In regard to individuals who were excused because of lack of transportation, 28 U.S.C. § 1871(f) provides that "[a] juror who must necessarily use public transportation in traveling to and from court, the full cost of which is not met by the transportation expenses [otherwise] allowable ..., may be paid the actual reasonable expense of such public transportation."

**56.** See juror questionnaire numbers 352250 (requested temporary excuse because of 2 children aged 9 and 10); 237970 (requested 3-month excuse because fulltime student); 116960 (3-month excuse requested because of planned vacation); 229760 (18-month excuse requested because of small baby); 179880 (requested temporary excuse because fulltime student); 531840 (grandson requested temporary excuse on behalf of 62-year-old prospective juror); 314600 (doctor requested 1-week temporary excuse on behalf of individual); 389010 (requested 1-month excuse until child got settled back in routine of school); 401200 (requested 6-month excuse because she could not arrange for child care); 041790 (prospective juror recently underwent operation but expected to recover in 2 months, "so please don't let this be the last time"); 127410 (requested temporary excuse because of planned vacation); 547960 (doctor requested temporary excuse on behalf of individual since she was pregnant); 263120 (requested 3-month excuse because of recent foot surgery); 002720 (doctor requested temporary excuse); 365830 (requested temporary excuse because mother scheduled for surgery which would take 6 to 8 weeks for recovery); 551810 (requested 1-month excuse because secretary to superior court judge and necessary for her to be present during that term of court); 445280 (requested temporary excuse because scheduled for thyroid surgery during time for which summoned); 089530 (requested temporary excuse because currently fulltime college student).

**57.** See juror questionnaire numbers 115200, 545310 and 573560.

**58.** See juror questionnaire numbers 478130 (requested excuse because 8 months pregnant); 400180 (requested excuse because beginning to teach class of multi-handicapped children and presence in classroom was necessary); 76850 (requested excuse because was to be hospital-

In addition to these 41 "hardship" exclusions, three persons were excused solely because they were age 70 or over, although they did not request an excuse.[59] The remaining challenged excuses were requested for medical reasons.

 Our concern with these challenged excusals is not so much with the fact that the jury clerk, rather than the district judge, granted hardship excuses; nor do we deem it appropriate to determine whether the district judge would have likewise granted such excuses. Rather, we find that these exclusions constitute serious violations of the Act and Plan since they were granted on a permanent basis when a temporary excuse, if any, was more appropriate.

The Plan is silent on the subject of hardship excuses. The Act, however, provides that "any person summoned for jury service may be (1) excused by the court, upon a showing of undue hardship or extreme inconvenience, for such period as the court deems necessary, at the conclusion of which such person shall be summoned again for jury service." 28 U.S.C. § 1866(c). "Undue hardship or extreme inconvenience" is defined as follows:

> great distance, either in miles or travel time, from the place of holding court, grave illness in the family or any other emergency which outweighs in immediacy and urgency the obligation to serve as a juror when summoned, or any other factor which the court determines to constitute an undue hardship or to create an extreme inconvenience to the juror; and in addition, in situations where it is anticipated that a trial or grand jury proceeding may require more than thirty days of service, the court may consider as a further basis for temporary excuse, severe

economic hardship to an employer which would result from the absence of a key employee during the period of such service.

28 U.S.C. § 1869(j).

The legislative history states:

> [E]xcuses may be granted for such period as the judge deems necessary. At the end of the period, the prospective juror shall be summoned again for jury service. When resummoned, such person may be reexcused if the hardship or inconvenience persists. The process of summons and excuse may be repeated as often as the judge determines that it is appropriate. When the cause for excuse finally ends, however, the person excused is to be summoned for service immediately without having his name reinstated in the qualified jury wheel.

[1968] U.S.Code Cong. & Ad.News 1792, at 1804. In addition, the Fifth Circuit in *Kennedy, supra,* noted that "a prospective juror drawn from the qualified wheel cannot permanently escape service because of hardship or extreme inconvenience. Even if he or she meets the strict standard for the excuse, the prospective juror must serve as soon as the hardship or inconvenience terminates. 28 U.S.C. § 1866(c)." *Id.* at 612 n.6.

It is clear beyond peradventure, therefore, that the Act contemplates only temporary excuses for hardship reasons. Turner, however, permanently excused these individuals because she was of the opinion that their requests for temporary excuses could not be feasibly accommodated. In her view, someone was either permanently excused from the qualified wheel or was set over for another particular panel. Since grand juries were empaneled only four or

---

ized at time for which summoned); 573970 (requested excuse on financial ground by stating "if you would pay by the day, where I would have enough money to go back and forth, I would go"); 078210 (requested excuse because pregnant and had had previous miscarriages).

**59.** See juror questionnaire numbers 213130; 228730; and 535300. Turner testified that she

excused persons over age 70, whether they requested an excuse or not, since she thought these persons would request an excuse when they reported. In addition, she sometimes telephoned persons over age 70 who did not request excusal to ask them if they wanted to be excused. There is no indication that these 3 individuals over age 70 requested an excuse over the telephone.

five times a year, Turner stated that, to her, it seemed impracticable to set over persons to another grand jury panel. Hence, persons summoned to serve on a grand jury were rarely set over to another panel.[60]

Turner was mistaken in her impression that temporary excusals could not be accommodated. Turner need only have provided the GSA with information relating to when a particular juror excused on hardship grounds would be able to serve. The computer then would have gone through the deferred names and picked any person who agreed to serve that month.[61] Turner's permanent excusals of virtually all persons excused after being summoned for grand jury service and prior to reporting, even if they requested a temporary excuse or indicated only an impermanent hardship, constitute a clear violation of the Act.

Similarly, Turner permanently excused from jury service all persons who were excused in court by the district court judge, regardless of the reason for the excuse.[62] Since only 23 persons may serve on a grand jury, and since as many as 16 individuals were excused in court to arrive at the proper number of grand jurors, some persons were obviously excluded merely because they were "surplus" jurors; many others had requested excuses only on "hardship" grounds. Turner excused these individuals permanently at all times except on the rare occasion when the district court judge specifically told her to set over a particular juror.[63] She never discussed with the district judges her practice. Those judges who testified stated that they were not aware of whether persons excused in open court were permanently excused or were put back in the qualified wheel. Judge O'Kelley, however, stated that it was his intention that persons excused by him in court would be returned to the qualified wheel unless they had a valid ground for permanent excuse pursuant to the Plan or Act.

Neither the Plan nor the Act grants an excuse for persons who have appeared in court to serve, but have not actually served, on a grand jury. Indeed, the Act makes a definite distinction between "appearing to serve" and "serving" by providing:

> In any two-year period, no person shall be required to (1) *serve or attend court for prospective service* as a petit juror for a total of more than thirty days, except when necessary to complete service in a particular case, or (2) *serve* on more than one grand jury, or (3) *serve* as both a grand and petit juror.

28 U.S.C. § 1866(e) (emphasis added). Like the Act, the Plan grants an optional excuse only if the individual "has *served* as a grand or petit juror." Local Plan at 88 (emphasis added). No excuse is available for those who have merely attended court for prospective service as a grand juror. The fact that the Act "contemplate that many persons who have been called but have not served may be called again" was recognized by the Fifth Circuit in *Smith, supra,* at 114.

Almost 50% of all persons summoned to serve on a grand jury were permanently excluded from the qualified wheel regardless of the reasons for which the excuse was granted. The practices of the jury clerk in permanently excluding from the qualified wheel virtually all persons who requested an excuse when summoned and virtually all persons who were excused in court by a district court judge, without regard to the reason for which a particular excuse was requested or granted, frustrate the Act's goal of granting exclusions from service on objective grounds only, and therefore constitute a substantial violation of the Act.[64]

---

**60.** Turner apparently believed that persons summoned for grand jury service could not be set over to a petit jury panel.

**61.** See Govt. Exh. 190 at ¶¶ 12 and 13.

**62.** Seventy-four persons summoned to appear were excused in court by a district court judge. All of these excusals were permanent.

**63.** This apparently never happened during the relevant time period.

**64.** In addition to constituting a violation of the objectivity principle, *Kennedy, supra,* indicates that the permanent exclusion of individuals because of hardship violates the randomness principle, since "the Act and its random selection policy leave no room for the additional

In sum, the erroneous practices of excluding qualified persons from the qualified jury and of wrongful granting of permanent excusals, when considered as a whole as prevailing in the Northern District of Georgia, significantly frustrate achieving objectivity as one of the major goals of the Act and Plan. We cannot overlook such serious, persistent deviations by accepting the government's argument that the number of wrongfully excluded prospective jurors, apportioned among four qualified jury wheels, amounts to only a small percentage of the 59,352 juror questionnaires mailed out and should be viewed as mere occasional administrative errors, of *de minimus* effect. Neither is it necessary to our decision that we uphold defendants' contention that of the 42,105 juror questionnaires which were returned, the clerk's office disqualified on nonobjective grounds, or otherwise wrongfully excused, as many as 1537 persons out of the total of 11,875 persons found to be disqualified. What is important, and has been effectively demonstrated to the court, is that the stated practices and procedures have been carried out by the clerk's office contrary to the mandate of the Act and Plan, and are violations of such substance and magnitude as to require our disapproval.

## CONCLUSION

This case represents perhaps the most intensive and far reaching challenge of the administration of a federal judicial district jury plan since the adoption of the Jury Selection and Service Act 13 years ago. The record clearly discloses that both sides have undertaken close examination and scrutiny of hundreds of executed juror questionnaires and have closely studied the manner in which the Local Plan has been administered. Moreover, the arguments of able counsel have assisted the court in a penetrating analysis of the mechanics of administering the jury selection process in a large metropolitan district. It is beyond cavil, however, that Congress and the district court in devising its Local Plan emphatically and specifically address as matters of prime concern the need for obtaining a fair cross section of the community to serve as grand and petit jurors in the federal district courts, selected objectively through a random process. The painstaking and detailed care of Congress and the district court to devise specific methods to accomplish these goals would be whittled away if courts fail to require their observance by judicial officers as well as court personnel who are charged with the responsibility for administering the jury selection process. The rule of reason, which regards inadvertent, imperfect efforts as insubstantial, must require that the jury selection process not become infected with subjective extra-statutory standards, nor can the rule of reason allow authorized methods of randomness to be displaced by private whim.

For these reasons, the court will direct the entry of an order sustaining the motions to dismiss the indictments of the affected defendants without prejudice, of course, to reindictment by properly selected and drawn grand juries. The court is mindful of the public interest in the Northern District of Georgia in minimal interruption of the orderly processes of the federal criminal justice system; for that reason, the court has given priority to resolving this controversy as promptly as possible considering a lengthy record. Dismissal of the indictment is the remedy required by the Act for substantial noncompliance. However, the remedy here applied need not result in long delay of reindictment because the district's new master and qualified jury wheels must, by law, be filled not later than September 1, 1981.[65]

Since new indictments are required, we see no basis for also granting the injunctive relief sought by the Federal Public Defenders Office, to make certain the requirements of the Act and Plan will be scrupulously followed in the future.

We wish to make clear that we do not believe that the jury clerk and her assist-

---

operation of personal preference on the part of those whose names are drawn for jury service." *Id.* at 612 n.6.

**65.** Under the Local Plan, the wheels can be refilled much sooner than September 1. See Local Plan at 86.

ants acted maliciously or in bad faith in making the errors heretofore described. Indeed, Turner appeared to us to be a dedicated public servant who performed the magnitude of tasks imposed on her, as she understood them, to the best of her ability. Rather, the violations which we have found resulted from lack of comprehension on her part as to the importance of following strictly the Act and Plan. We believe that these problems arose in large part because of the failure of Turner's superiors to properly supervise the jury clerk. Regardless of the reason for these errors, however, we are convinced that, whether viewed separately or in combination with each other, they constitute a substantial failure to comply with the Act and Plan.[66]

Our disposition of these cases on the foregoing grounds renders it unnecessary to consider the constitutional challenges raised by Rule 12(b) motions, F.R.Crim.P., previously bifurcated by this court on January 5, 1981.

---

**66.** All violations, i. e., nonrandom drawing of starting numbers and failure to post adequate notice; erroneous excusals, exemptions and disqualifications; and erroneous permanent excusals after summoning, apply to all defendants except the starting number/notice violation does not apply to defendant Stowers in No. 80 276A, since he was charged with an information and was not indicted, or to defendants Bearden (No. 80–14N) and Nixdorf (No. 80-313A) since these two defendants were indicted after the starting number/notice violations was corrected.