UNITED STATES of America

v.

Millard Clifford HALEY, Francis William Hewes, Howard E. Caldwell, William T. Brooks, Gene M. Simpson, Walter Langford and Charles Franklin Caldwell.

Crim. A. No. CR81–09A.

United States District Court, N. D. Georgia, Atlanta Division.

Aug. 27, 1981.

Raoul Lerow, Atlanta, Ga., for Brooks.

Michael Ford, Atlanta, Ga., for Simpson.

Thomas F. Choyce, Atlanta, Ga., for Charles Caldwell.

Jay L. Strongwater, Atlanta, Ga., for Langford.

## CONSTITUTIONAL CLAIM

TIDWELL, District Judge.

The defendants challenge the composition of the 1981 traverse jury in the Atlanta Division pursuant to the Fifth and Sixth Amendment to the United States Constitution. The thrust of the defendants' claim is that blacks are systematically excluded from the jury lists in the Atlanta Division of the Northern District of Georgia by the use of voter registration lists as the sole source for composing the master wheel. In support of this contention, the defendants have produced an array of statistical evidence to indicate the degree and cause of the alleged disparity in the selection system for the Atlanta Division. Furthermore, the defendants sought to provide evidence that voter registration was a tainted source for composing a representative jury due to a variety of alleged barriers to voter registration by blacks. At the close of the defendants' evidence the government moved for denial of the defendants' Motion to Stay Proceedings Based on the Statutory and Constitutional Deficiencies in the Jury Selection and Empanelment Process on the grounds that the defendants had failed to establish a prima facie case. The court orally granted the government's motion on August 13, 1981 with opinion to follow.

In *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), the Supreme Court clearly set out the elements of a prima facie case under the fair cross-section requirement:

> The defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in the venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the communi-

Howard J. Manchel, Gignilliat, Manchel, Johnson & Wiggins, Atlanta, Ga., for defendant Haley.

Alan Begner, Atlanta, Ga., for Hewes.

J. Kevin Buster, King & Spalding, Atlanta, Ga., for H. Caldwell.

ty; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection. 439 U.S. at 364, 99 S.Ct. at 668

Assuming without deciding that the defendants have established the first and third prong of the prima facie case, the defendants' challenge falters on the essential showing that a significant disparity exists between the group's numerical presence in the community and its representation on the master jury wheel.

The defendants' expert witness has generated extensive calculations to substantiate the defendants' ultimate conclusion that a significant disparity exists. The defendants express this conclusion in two alternative forms termed absolute disparity and comparative disparity. Absolute disparity, the traditional yardstick for measuring the disparity of representation, is a calculation of the difference between the percentage of the group in the population and the percentage of the group in the master wheel. Comparative disparity requires yet another step of dividing absolute disparity by the group's percentage of the eligible population. It is necessary to realize that the comparative disparity calculation tends to magnify the size of the disparity as the relevant group's percentage of the population decreases.

■ Initially, the court notes that the defendants' statistical proof is premised on the percentage of blacks in the total population of the Atlanta Division rather than the percentage of blacks in the eligible population. Case law indicates that a calculation based on eligible population is preferable and provides a more accurate picture of representation. *See, Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1978); *Taylor v. Louisiana*, 419 U.S. 522, 531, 95 S.Ct. 692, 698, 42 L.Ed.2d 690 (1974); *United States ex rel. Barksdale v. Blackburn*, 639 F.2d 1115 (5th Cir. 1981); also see, *Gewin, An Analysis of Jury Selection Decisions*, appended to *Foster v. Sparks*, 506 F.2d 805, 832–33 (5th Cir. 1975). Nevertheless, on rare occasions, courts have relied upon general population figures.

*See, Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977). *Turner v. Fouche*, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970). In this case, the defendants have incorporated the 1980 census findings of racial composition in the Atlanta Division. These findings are based on the general population of the Atlanta Division and will not be supplemented with the age eligible breakdown until later this fall. Since the 1980 census general population figures are preferable to the 1970 age eligible figures due to changes in population size and location within the Division, the court will use the 1980 census figures for analysis of the disparity. The court is mindful that the expert testimony in the hearing indicated that a further breakdown into age eligibility would likely reduce the size of the disparities which will be stated, although the defendants contend that any such reduction would likely be offset by the "undercount" of the relevant population.

A compilation of the figures relevant to the defendants' constitutional challenge of the jury selection process follows:

| | |
|---|---|
| % of population which is black | 25.0% |
| % of master wheel which is black (assumed by defendants from figures for voter registration representation | 18.67% |
| Absolute disparity | 6.33% |
| Comparative disparity | 25.3% |

The significant figure for the fair cross-section rule is the 6.33% absolute disparity. Although the Supreme Court has "never announced mathematical standards for the demonstration of 'systematic' exclusion of blacks," *Alexander v. Louisiana*, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972), courts have clearly arrived at the conclusion that more than 10% absolute disparity is necessary to implicate a violation of the fair cross-section rule. *Swain v. Alabama*, 380 U.S. 202, 208–9, 85 S.Ct. 824, 829, 13 L.Ed.2d 759 (1965); *United States v. Butler*, 611 F.2d 1066, 1070 (5th Cir.), *cert. denied sub nom. Fazio v. United States*, 449 U.S. 830, 101 S.Ct. 97, 66 L.Ed.2d 35 (1980); *United States v. Maskeny*, 609 F.2d 183, *cert. denied* 447 U.S. 921, 100 S.Ct. 3010, 65

L.Ed.2d 1112 (1980); *Thompson v. Sheppard*, 490 F.2d 830 (5th Cir. 1974) *cert. denied* 420 U.S. 984, 95 S.Ct. 1415, 43 L.Ed.2d 666 (1974). The defendants' statistic of 6.33% is plainly insufficient to establish a significant underrepresentation of blacks on the master wheel. Furthermore, when the figure of 6.33% is viewed in light of expert testimony which indicated that the absolute disparity would likely be reduced by an age eligible breakdown, the defendants showing of absolute disparity appears even less formidable.

Having failed to make a significant showing of absolute disparity, the defendants urge the court to rely on the alternative figure of 25.3% comparative disparity. The defendants contend that Supreme Court decisions do not restrict the type of statistics which may be used to establish a prima facie case and that comparative disparity is a better indication of underrepresentation. An examination of Supreme Court and Fifth Circuit decisions, however, shows a distinct preference for statistical evidence expressed in terms of absolute disparity. *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979); *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977); *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1974); *United States v. Butler*, 611 F.2d 1066 (5th Cir. 1980); *See also, Gewin, An Analysis of Jury Selection Decisions*, appended to *Foster v. Sparks*, 506 F.2d 805, 834 n. 119 (5th Cir. 1975). Cases which have mentioned the statistic of comparative disparity have done so only in conjunction with their reliance on absolute disparity and have adhered faithfully to the 10% demarcation stated in *Swain*. *See, United States v. Clifford*, 640 F.2d 150, 155 (8th Cir. 1981); *United States v. Maskeny*, 609 F.2d 183, 190 (5th Cir. 1980); *Berry v. Cooper*, 577 F.2d 322, 326 n. 11 (5th Cir. 1978); *United States v. Test*, 550 F.2d 577, 589 (10th Cir. 1976); *United States v. Manbeck*, 514 F.Supp. 141, 149 (D.S.C.1981); *United States v. Holman*, 510 F.Supp. 1175, 1180 (N.D.Fla.1981); *United States v. Facchiano*, 500 F.Supp. 896, 898–99 (S.D.Fla.1980); *United States v. Blair*, 493 F.Supp. 398, 480 (D.Md.1980);

*United States v. Jenison*, 485 F.Supp. 655, 663–64 (S.D.Fla.1979); *United States v. Rosenthal*, 482 F.Supp. 867, 873 and 889 (M.D. Ga.1979). While the Fifth Circuit continues to leave open the question of whether reliance on comparative disparity is appropriate in circumstances where the group's percentage of eligible population is less than 10%, the facts of this case do not present such an issue. *See, United States v. Maskeny*, 609 F.2d 183, 190 (5th Cir. 1980); *Gewin, An Analysis of Jury Selection Decisions*, appended to *Foster v. Sparks*, 506 F.2d 805, 834–35 (5th Cir. 1975). Accordingly, the court finds the defendants' constitutional claim without merit.

### STATUTORY CHALLENGES

The defendants also have alleged a number of violations of the Jury Selection and Service Act, 28 U.S.C. § 1861 *et seq.* [hereinafter, "the Act"].

■ In order to successfully assert a violation of the Act the defendants must show a "substantial failure to comply with the Act"; that is, one which adversely affects the legislative goal of random selection of jurors from a representative cross section of the community, by "affect[ing] the random nature or objectivity of the selection process." *United States v. Kennedy*, 548 F.2d 608, 612 (5th Cir.), *cert. denied* 434 U.S. 865, 98 S.Ct. 199, 54 L.Ed.2d 140 (1977). For a more detailed discussion of the principles underlying the construction of "substantial failure to comply", *see United States v. Northside Realty Associates, Inc.*, 510 F.Supp. 668, 685 *et seq.* (N.D.Ga.1981).

The defendants have pointed out particular practices and incidents in the construction of the petit jury lists which, they contend, affect the random nature of the selection process. they also challenge a number of exemptions granted to prospective jurors as violative of objectivity.

In presenting these alleged violations of the Act, the defendants have asserted that this court has an enhanced duty to correct all statutory violations in light of Judge Keady's order in *United States v. Northside*

*Realty Associates, Inc., supra*, citing *Berry v. Cooper*, 577 F.2d 322 (5th Cir. 1978), and *Broadway v. Culpepper*, 439 F.2d 1253 (5th Cir. 1971). However, both of these decisions dealt with constitutional claims of systematic exclusion, which were expressly reserved in the *Northside* decision and have not been found here. These cases are thus inapposite and do not provide any authority for deviation from the standards of the Act as interpreted by the Fifth Circuit.

The alleged violations of the Act's principles of randomness include: the alphabetical listing of jurors after the initial selection process; the use of an incorrect starting number in Fulton County; the omission of the first name selected in six counties; the use of obsolete voter registration lists; and the inability of the computer program to accept or delete names once the master jury wheel has been completed.

■ To determine if these incidents rise to the level of substantial violations, it is necessary to explore the concept of "randomness" employed in the Act, and discussed by the Senate Committee on the Judiciary in its Report on the Act. Random selection, while one of the two important general principles of the Act, does not require true or absolute statistical randomness:

It is also true that, to the extent that the bill does provide for random selection, it does not insist upon randomness in the sense in which that term might be understood by statisticians. Many districts may seek the aid of statisticians in developing systems of selection that do meet the standards of that profession, and they are encouraged to do so. No doubt such systems enhance the likelihood of attaining the cross sectional goal of the bill. But for reasons of administrative feasibility your committee did not deem it necessary to require the use of random selection in the statistical sense. It is sufficient for the purpose of this legislation if the plan adopts some system of selection that affords no room for impermissible discrimination against individuals or groups.

Thus, for example, the plan may specify selection of every 76th name from the voter list, or every name at the bottom of a page in the list, or all the names on the list, even though in certain cases statisticians might not agree that truly random selection would be the result. Likewise, in drawing names from the mastet [sic] and qualified jury wheels some similar processes may be designated . . . . S.Rep. No. 891, 90th Cong., 1st Sess. 16, n. 9 (1967)

■ The defendants first complain that the arrangement of jurors' names in alphabetical order after the initial selection process violates the principle of random selection. This practice, and the related practice which returns jurors during their service to the petit jury list without any changes in their sequence on that list, may result in a given panel of jurors travelling through the system as a group.

As the Senate Committee on the Judiciary observed, "[t]he bill does not require that the jury for an individual case be drawn at random directly from the qualified jury wheel. Instead, it permits procedures designed to utilize jurors more efficiently, such as jury 'pools' and 'rotation' systems." S.Rep. No. 891, 90th Cong., 1st Sess. 32 (1967). Absolute or "true" statistical randomness is thus not required for reasons of administrative feasibility. While an additional random selection might be better in terms of fairness to counsel trying a number of cases in a short period of time, by decreasing the chance that a given panel of jurors would remain as a group and meet the same attorney again, the lack of such an additional selection is not a deficiency in terms of the Act, the Local Plan, or the Constitution.

The preparation of the Fulton County jury list with an incorrect starting number, or, rather, the incorrect application of the proper starting number, is also challenged. Testimony was given that the voter registration list tape prepared for Fulton County contained an entry of an identification or "control record", which was mistakenly read by the computer as the first entry of a

voter's name and address. Therefore, in selecting names for the jury wheel on the basis of a starting number and increment— i. e. the 6th name on the list and every name at a particular interval thereafter—it appears that the computer chose not the sixth but the fifth actual name, thus selecting throughout the program the name immediately preceding the one that should have been chosen.

Another computer error pointed out by the defendants was the result of a divergence in the methods used to select jury wheels in Fulton County and in the federal system. In the selection of the Fulton County state court wheel from the county's computerized voter registration list, it is not customary to summon the person occupying the starting number's position on the list. Thus, in the six counties that maintain computerized voter registration lists, the Fulton County practice was erroneously applied, and six voters were improperly omitted from the jury wheel.

■ The defendants have made no showing that these inadvertent computer errors in application of properly chosen starting numbers constitute violations of the Act or of the Local Plan. Assuming, *arguendo,* that there are such violations, the defendants have not shown that as a result the principles of randomness have been violated by "impermissible discrimination against individuals or groups" so as to amount to a substantial failure to comply with the Act.

■ The defendants also alleged that in a number of counties obsolete voter registration lists were used to prepare the jury list in violation of the Act and the Local Plan. The government objected to this allegation as untimely, because it was not raised until the time of the hearing. However, upon inquiry by the court, the defendants were unable to specify which, or how many, counties they believed had used such lists. They inferred the existence of different lists from discrepancies found in the totals in computer printouts and the totals submitted to the clerk of the court by the counties. Regardless of its timeliness, such an inference does not constitute a showing

that different voter registration lists were used, and in fact amounts to little more than speculation. A number of equally plausible reasons for these discrepancies could be advanced.

■ The defendants' last challenge on the basis of the random selection requirement of the Act also involves the granting of excuses to prospective jurors. The defendants have pointed out that the computer program presently in use does not allow the addition or deletion of names once the master jury wheel is completed. Therefore, the defendants contend, prospective jurors who are excused from service for an indefinite time cannot be replaced in the wheel at some uncertain future date, and will thus be excluded altogether. In addition, the defendants complain that those jurors excused for a time certain are automatically selected for duty as soon as that time period expires. These jurors, they maintain, should undergo another selection in order to ensure the randomness of the process.

These contentions are without merit. It is not necessary that jurors be excused for a time uncertain, nor that names "pulled" for a time certain be chosen on a random basis for a second time. This is analogous to the non-random return of jurors already selected at random to the juror pool, and does not affect the randomness of the system within the meaning of the Act.

The defendants have also alleged these violations of the Act's principle of objectivity: the wrongful exclusion of a number of jurors from service on the bases of public service employment, illiteracy, and residence; and the wrongful disqualification of voters moving from one division to another within the Northern District of Georgia.

The Senate Committee on the Judiciary observed: "The second principle—determination of disqualifications, excuses, exemptions and exclusions on the basis of objective criteria only—is designed to work with random selection to produce juries that represent the community fairly. In essence, this principle would prohibit the widespread current practice of imposing qualifications

above and beyond those specified by Congress." S.Rep. No. 891, 90th Cong., 1st Sess. 17–18 (1967).

This principle of objectivity, therefore, is aimed at preventing the application of non-objective, extra-statutory or -plan criteria in determining juror qualifications, *United States v. Evans*, 526 F.2d 701 (5th Cir.) *cert. denied* 429 U.S. 818, 97 S.Ct. 62, 50 L.Ed.2d 78 (1976); *United States v. Northside Realty Associates, Inc.*, 510 F.Supp. 668, 699 (N.D.Ga.1981).

The defendants have offered in support of their contentions the testimony of Mr. Friedman, a statistical consultant with training in applied mathematics, probability and statistics, and computer science. Mr. Friedman presented a list of eighty-one juror questionnaires which, in his opinion, were improperly excluded. Thirteen of these people were disqualified on the basis of illiteracy; eight were exempted from service as public officials; sixty did not fulfill the residency requirements.

■ The only application of non-objective, extra-statutory or -plan criteria alleged here is the defendants' contention that an informal, unwritten policy of a six-month residency requirement existed. While Mr. Friedman testified that in his opinion such a policy existed, no other testimony or evidence was offered to support his opinion, and the court must conclude that the defendants have failed to show the existence of such a requirement.

As for the literacy disqualifications and public service exemptions, even if these exclusions did result from application of non-objective criteria—which has not been shown—the defendants have offered no case law or statutory support for the assertion that these are improper. No testimony other than that of Mr. Friedman was presented on this point; we are left with the opinion of an expert not qualified in the area in question. This testimony alone does not amount to a showing of a violation of the Act.

■ The defendants' final challenge alleges that voters moving to another division within the District are wrongfully excluded, as they cannot be returned to the master jury wheel after its completion. However, the 1980–1981 Jury Wheel Revision Procedure [Defendants' Exhibit # 6] provides under Item D10: ". . . . Each person should be qualified in the county in which he is registered to vote, as long as he is still in the District, even though he has moved into a different division since he registered to vote. . . ."

Mr. Friedman testified that two persons were nonetheless wrongfully excluded on the basis of intra-district moves in the sample of 500 questionnaires that he examined; however, these questionnaires apparently were not tendered into evidence. Of the sixty questionnaires challenged on the basis of residence, only five had moved within Georgia. Four of those questioned had moved from the Southern District; and while the fifth had moved from DeKalb County to Gwinnett, she had not resided in both counties for a total of one year. On this contention the defendants have failed to make a *prima facie* showing that either the Act or the Local Plan has been violated.

■ "We do not think that infrequent, simple, inadvertent deviations in random selection of starting numbers [and adequacy of public notice] should constitute a substantial failure to comply with the Act or the Plan and result in harsh consequences of dismissal of indictments. That a standard of perfection in achieving randomness was not contemplated by Congress is clear from the legislative history." *United States v. Northside Realty Associates, Inc.*, 510 F.Supp. 668, 694 (N.D.Ga.1981). "Isolated examples of mistaken exclusion . . . alone do not afford a valid basis for challenging the [grand] jury. . . ." *United States v. Evans*, 526 F.2d 701, 706 (5th Cir. 1976).

■ Even if every practice challenged by the defendants did constitute a violation, none operated to frustrate the goals of the Act or the Local Plan and thus did not rise to the level of a substantial violation requiring a dismissal or stay.

The defendants having failed to make out a *prima facie* case the defendants' Motion to Stay Proceedings Based on the Statutory and Constitutional Deficiencies in the Jury Selection and Empanelment Process is hereby overruled and denied upon each and every ground.